## NATIONAL LABOR RELATIONS BOARD v. CLINCHFIELD COAL CORPORATION.

### No. 5222.

Circuit Court of Appeals, Fourth Circuit.

Oct. 3, 1944.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

Mozart G. Ratner, Attorney, National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, General Counsel, Howard Lichtenstein, Assistant General Counsel, Malcolm F. Halliday, Associate General Counsel, and Owsley Vose, Attorney, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

William A. Stuart, of Abingdon, Va., for respondent.

SOPER, Circuit Judge.

The order of the National Labor Relations Board, for which enforcement is prayed in this case, requires the Clinchfield Coal Corporation to cease and desist from discouraging membership in the United

Mine Workers of America, District 29, to withhold recognition from and to disestablish certain inside unions, to-wit: the Clinchfield Employees' Association, Inc., and the Dante-Clinchco Independent Union Inc., to reimburse its employees for dues withheld from them and paid to the Association, to offer reinstatement with back pay to twelve discharged men, to make whole six employees for losses due to discriminatory working conditions, and to post appropriate notices in its mines. The main question for decision is whether the Board's findings of unfair labor practices, which its order was designed to correct, were supported by substantial evidence.

There is evidence that prior to the passage of the National Labor Relations Act on July 5, 1935, 29 U.S.C.A. § 151 et seq., the Coal Company resisted the efforts of the United Mine Workers to organize the Company's mines; that in 1933, when these efforts began, the Company closed one of its mines to discourage membership in the Union and later actively promoted the formation of the Association as an inside rival organization; that thereafter, the Coal Company entered into a contract with the Association and kept a close watch upon its actions, discharged employees who attended meetings held on behalf of the Union and refused reinstatement until the men promised to abstain from further union activity.

There is also evidence that after the passage of the Act, the Coal Company engaged in practices which constituted violations of the statute. The Coal Company continued its supervision of and interference with the affairs of the Association; dues and assessments were deducted from the wages paid to the Association, and contracts with the Association were renewed from time to time; and when activities of the employees on behalf of the Union were renewed in later years, the Coal Company took occasion to discourage them and to dissuade its employees from joining the Union; and finally in January, 1942 of its own motion entered into a closed shop agreement with the Association accompanied by the check off of dues.

Charges of unfair labor practices on the part of the Company were filed by the Union with the Board in August, 1941 and amended from time to time thereafter. These charges led to negotiations between representatives of the Board, the Union and the Coal Company which resulted in a compromise agreement of July 16, 1942, later approved by the Board. Therein the Company agreed to refuse recognition to the Association and to disestablish it, and also agreed not to discourage membership in the Union or any other labor association of its employees by discriminatory conduct. The Company also agreed to reinstate with back pay certain employees it had discharged, and to post on its plant appropriate notices which fully notified the employees of the terms of the stipulation. It was understood that this agreement of settlement covered all matters in controversy. The Union's charges were dismissed and the notices were accordingly posted. On the same day, to-wit, July 16, 1942, it was agreed that an election by secret ballot should be held among the employees on August 15, 1942, under the supervision of the Board, to determine whether or not they desired to be represented by the Union for purposes of collective bargaining. The election was held and 1305 valid votes were cast, of which 527 were cast for and 778 were cast against the Union. The conduct of the Coal Company during the election campaign constitutes the first action on the part of the Coal Company, after the settlement, which the Board found to be in violation of the Act. The Board found that the Coal Company solicited votes against the Union and thereby interfered with and coerced its employees in the exercise of their rights guaranteed by § 7 of the Act; and the final order of the Board directed the Company to cease and desist from all interference with the employees in the exercise of their right to self organization. We examine first the evidence adduced to support this finding and conclusion.

The evidence consisted of statements made during the election campaign to certain of the prospective voters by a few foremen or supervisory employees, which indicated that they and the Company itself hoped that the Union would lose the election; and it was also shown that leading members of the Association, whose disestablishment had been agreed to and directed, took an active part in the fight against the Union by distributing hostile campaign material and in other ways. On the other hand, there was strong and convincing evidence, which the Board ignored in its discussion of the case, that the Company had taken vigorous measures through verbal instructions, published notices and disciplinary measures to preserve its neutrality and

to prevent its foremen from interfering with the free choice of the men; and it is significant that after the polls closed on the election day, the Board's representative, in charge of the contest, announced the result and made the public statement that he had wide experience in holding elections in the United States and that he had not held any in which the conditions were as good and therefore he desired to thank the participants for their cooperation.

■ Viewing the case as a whole, however, and taking into consideration the record of the Company's anti union activity prior to the settlement of 1942, we cannot say that the Board lacked substantial basis for its finding. It has been held that an employer is amenable to the Board's authority on account of unfair labor practices of its supervisory employees if it secures an advantage therefrom, even if it has not authorized or sanctioned them. In H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S.Ct. 320, 323, 85 L.Ed. 309, it was said: "We do not doubt that the Board could have found these activities to be unfair labor practices within the meaning of the Act if countenanced by petitioner, and we think that to the extent that petitioner may seek or be in a position to secure any advantage from these practices they are not any the less within the condemnation of the Act because petitioner did not authorize or direct them. - In a like situation we have recently held that the employer, whose supervising employees had, without his authority, so far as appeared, so participated in the organization activities of his employees as to prejudice their rights of self-organization, could not resist the Board's order appropriately designed to preclude him from gaining any advantage through recognizing or bargaining with a labor organization resulting from such activities."

In International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, it was said: "The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." See, also, N.L.R.B. v. A. S. Abell Co., 4 Cir., 97 F.2d 951; N.L.R.B. v. Aintree Corporation, 7 Cir., 132 F.2d 469.

The next question to be considered relates to the sufficiency of the evidence to support the finding of the Board that the Company dominated and interfered with the formation of the organization known as the Dante-Clinchco Independent Union, Inc., which was formed after the election had been held and the earlier Association had been dissolved. The Board held that the new body was merely a substitute for the old and was itself the product of the Company's interference, domination and support, and therefore ordered it to be disestablished. The evidence in respect to the formation of the Independent may be summarized as follows:

When the compromise agreement was under consideration in May or June, 1942, a conference took place between representatives of the Association and their attorney, in the absence of any representative of the Company, to decide whether to agree to disestablish the Association and later form a new organization. Later another conference was held between the Association, its attorney, the general manager of the Company and the Company's attorney, and inquiry was made whether the Association was willing to agree to its disestablishment. During the meeting the general manager inquired whether if the Association was disestablished a new organization could be formed whereupon the Company's attorney rebuked him and said that the trouble then under consideration had been caused by too much interference and the general manager "hushed up". Representatives of the Association agreed to the disestablishment.

During the election campaign that followed representatives of the Association met with their attorney a number of times and discussed methods of defeating the Union at the election, and as we have seen, certain material hostile to the Union was distributed. At these conferences plans for the formation of a new organization in case the Union should be defeated at the election were discussed. The attorney warned the Association that none of its officers could serve as officers of the new body but names of suitable persons to hold offices therein were suggested.

After the election the Association was formally dissolved on September 23, 1942, and thereafter the officers of the Association did not participate in the organization of the Independent. In October the men who had been suggested as officers for the new body met in the office of the attorney and signed articles for the incorporation of the Independent. Meetings of the officers were thereafter held from time to time but no meeting of the members has been held.

No representative of the Company has attended any meeting of officers of the Independent; no communication was received from the Independent by the Company until October 23, 1942 when the Company was notified that the Independent had been chartered and was ready to organize. It sought permission to solicit members amongst the employees and to use the bulletin boards of the Company for this purpose. Permission was granted but at the same time similar permission was granted to the United Mine Workers and also the American Federation of Labor which had entered the field. The Independent posted notices and distributed a printed circular on October 28, 1942, in which it announced that it was an independent organization separate from and not a successor to the Association, and that it was in no way sponsored by or connected with the management of the Company which had expressed no favor or disfavor with respect to it. The membership of the Association was about 700 in February, 1943 when the hearing before the trial examiner in this case began. When the Independent posted these notices in October, 1942 the Company also posted a notice declaring its complete neutrality, notifying the employees that they were free to choose any labor organization whatsoever and warning all foremen and supervisory employees to remain neutral and abstain from interference with the organization of the employees on pain of disciplinary action.

Charges that the Company had dominated and interfered with the organization of the Independent were filed by the United Mine Workers with the Board on October 29, 1942. The Independent has never applied to the Company for recognition and has not entered into contractual relations with it.

■ Upon this review of the facts, it is our opinion that there was not sufficient evidence to support the finding that the Company had dominated or interfered with its employees in the organization of the Independent, and it follows that the order of the Board should be modified by eliminating the requirement that the Independent should be disestablished.

The next instance concerns the refusal of the Company to reemploy employees Burchett and Rakes on October 10, 1942, and the conclusion of the Board that reemployment was denied because of their Union membership and activities on behalf of the Union during the election campaign in July and August, 1942. Upon these findings the Board directed that these employees be offered immediate reinstatement and made whole for any loss of earnings they may have suffered by reason of the Company's action. The evidence shows that these men have been with the Company for a long time. They joined the Union in 1933 and were promptly discharged. They were later reemployed and remained with the company until the spring of 1942 when they were granted leave from their positions in the mine so that they might engage in farming during the summer months. They testified that they were active in behalf of the Union during the election campaign and that when they applied for reemployment on October 10, 1942 they were refused by the general manager of the Company.

The evidence on the part of the Company tended to show that the men were refused reemployment because for certain reasons they had become personally obnoxious to the general manager and because they had refused to return to work at an earlier date when requested so to do by the Unemployment Compensation Commission.

■■ The Board nevertheless drew the inference from the testimony that the true reason for the refusal of reemployment was the activities of the men on behalf of the Union during the election campaign and as

this is a question of fact upon which the Board's findings are conclusive, if supported by substantial evidence, it is our opinion that this portion of the Board's order should be enforced. N.L.R.B. v. Security Warehouse & Cold Storage Co., 9 Cir,. 136 F.2d 829, 833, 834.

The next matter in controversy arose over the disposal of rock which occurs between seams of the coal in the Company's mines and which must be disposed of so as not to obstruct the passage of the coal cars. Each section of the mine consists of a group of rooms where the coal is cut by two men working together. A track is provided in each room on which the coal car is moved near to the face of the coal at the end of the room. The track is nearer to the right rib of the seam or the clearance side of the room so that in a typical instance of a room 24 feet wide the track will be within 6 feet of the clearance side. The other side of the room is called the gob side where the rock removed from the face of the mine is piled or gobbed out of the way so as not to interfere with the passage of the cars and at the same time to save the considerable expense of removing it completely from the mine.

■ The essence of the controversy lies in a conflict of evidence as to the handling of the rock from the clearance side. It is not disputed that it was the custom in the company's mines to gob the rock from the gob side so long as there was room for it; and the Company's evidence strongly tends to show that in this and all other bituminous coal mines the same course has been pursued with the smaller amount of rock taken from the area on the clearance side. The gobbing of the rock from the clearance side involves somewhat more effort on the part of the men since the miner on the right is obliged to pass the material to the man on the gob side who places it on the gob pile. But there was contrary evidence offered by the Board that rock cars were furnished for the removal of rock not only when there was not room for it on the gob side but also for the removal of rock from the clearance side even though there was room to gob it. It was estimated that in some instances every third car was used for the removal of rock on the clearance side. The Board approved the finding of the trial examiner, that for at least a year before December 9, 1942, when the dispute arose, miners had been provided with rock cars

for the removal of rock from the clearance side and that this custom prevailed not only in Section 6, where the rock was unusually thick and where the dispute arose, but also in other sections of the mine. Although the Company strenuously insists that its weighty testimony to the contrary is more credible, especially as it indicates a less expensive practice, we must accept the finding of the Board since there is evidence to support it.

On December 9, 1942, the foreman of the section called first left off sixth right of No. 9 mine notified the coal loaders therein that he had been instructed not to let them have a rock car without his previous consent and in two rooms, 18 and 23, rock cars were refused to the men contrary to what the Board found to have been the previous custom. On December 10 rock cars were refused to the loaders in these two rooms and also in rooms 19 and 24. The loaders refused to dispose of the rock on the clearance side and sat down and did no work. On December 10, two of the employees in this section presented a complaint to the general manager of the mine but the complaint was refused and no rock cars were provided for these rooms and no more coal was removed from them until after the strike, which will be hereinafter discussed.

■ The Board found that there was no evidence that this practice was introduced in any other part of the mine at the time but that in other sections the company continued to furnish rock cars in accordance with its previous practice. The Board, pointing out that this section was the only one where all the employees were union members, reached the conclusion that on this account the Company imposed discriminatory working conditions and that this conduct constituted interference, restraint and coercion of the employees within the meaning of Section 8(1) of the Act, and also discrimination in regard to a condition of employment whereby membership in the Union was discouraged in violation of Section 8(3) of the Act. The finding was based in part upon the fact that the respondent's refusal to furnish rock cars to the employees in question prevented them from working during a part of the period from December 9 to December 14, whereby they sustained a partial loss of earnings. We think that it cannot be said that there was not sufficient evidence to sustain the finding.

See N.L.R.B. v. New Era Dye Co., 3 Cir., 118 F.2d 500, 505, 506; N.L.R.B. v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, 493, 494; N.L.R.B. v. Faultless Castor Corp., 7 Cir., 135 F.2d 559, 561, 562; Continental Oil Co. v. N.L.R.B., 10 Cir., 113 F.2d 473, 484; N.L.R.B. v. Waterman S.S. Co., 309 U.S. 206, 218, 60 S.Ct. 493, 84 L.Ed. 704.

The controversy over the disposition of the rock led to a strike and certain miners were discharged and refused reinstatement. The final question for determination was whether there was substantial evidence to support the finding of the Board that this action on the part of the management was not justified by unlawful interference with the operation of the mines by the discharged men as the Coal Company contends, but constituted discrimination in regard to hire or tenure of employment in violation of Section 8(3) of the Act and also constituted a violation of Section 8(1) of the Act as an interference with the exercise of the right of the employee to bargain collectively through representatives of their own choosing guaranteed by Section 7 of the Act.

Certain facts relating to the strike are not disputed. On Sunday, December 13, following the refusal of certain coal loaders to gob the rock from the clearance side as above described, a meeting of the Local Union of the United Mine Workers, attended by 80 members, was held. The miners involved in the rock car dispute presented their grievance and it was unanimously resolved that the Grievance Committee take up the matter with the Mine Superintendent for adjustment. No strike vote was taken. Early on the following Monday morning, December 14, the committee waited on the superintendent who stated that he had no power to settle the dispute and that it did not pay the Company to furnish cars to take out the rock and the miners would have to gob it. When this statement was reported to a crowd of about 100 workers, who had gathered outside the mine office, they shouted that they would not work until the dispute was settled, and so the strike began.

One of the leaders of the strike placed an electric motor, used for hauling cars, outside the mine No. 9 on the key switch so that the entrance to the mine was effectually blocked and no cars could be taken in or out. A mine foreman boarded this motor for the purpose of moving it and clearing the track but he was requested not to move it until the dispute was settled. The operation of the mine was thus prevented and increasing numbers of men, who came to work, remained outside. Another fruitless conference between the superintendent and the Grievance Committee took place in the mine office and when the result was reported to the men they again shouted that they would not work until the question was settled.

The motor remained in this place at the mouth of the mine all of Monday, Monday night and Tuesday until the strike leaders were discharged and the strike was broken. A group of miners, including five of the discharged strike leaders, remained at the mouth of the mine throughout all of Monday night, building a fire to keep themselves warm. Although the motor blocked the track and the mine could not be operated, the management, being fearful of violence from reports made to it, instructed the foremen to avoid dangerous conflicts with the men and not to move the motor against their will. The trial examiner and the Board found that the strike leaders did not use threatening and violent language or forbid the motor to be moved from this place, as the evidence of the Coal Company tended to show. Nevertheless the evidence is open only to the one conclusion that the motor was placed on the key switch in order to block the entrance to the mine so as to prevent miners from going to work and to promote the efficiency of the strike.

The same conclusion must be reached in regard to occurrences at adjacent mines Nos. 7 and 8, to which the strike spread on the following Tuesday morning, December 15. Again the entrance to the mine was blocked by a motor. Members of a group of miners assembled at the mouth of the mine and asked a foreman who endeavored to clear the track not to move the motor and he acquiesced. The result was that the mines were not worked that day.

These occurrences led to conferences between the management and the company's attorney, which began Monday night, to consider what method should be adopted to secure the reopening of the mines which had been producing 6,000 tons of badly needed coal per day. It was determined on Tuesday to discharge the men whose interference with the operation of the mine had caused the shutdown. Ten men were

listed for discharge including seven who had been active at the No. 9 mine on Monday and three who were believed by the management to be the leaders in impeding the entrance to the No. 7 mine on Tuesday. A notice of dismissal characterizing the action of the men as a wildcat strike and warning the discharged men that they were forbidden to trespass on the company's property was posted at the entrances to the mines. This characterization of the strike was repeated in another notice simultaneously posted which stigmatized the small group of men who prevented the operations of the mines as saboteurs and the cutting down of the supply of coal for war plants as sabotage. Finally, late on Tuesday, the sheriff of the county, at the request of the management, served copies of the notice of discharge on the men and warned them not to trespass on the mine property. The men accepted the notice of discharge, left the property and the strike was ended.

The trial examiner took the position that the evidence of the Coal Company concerning the reasons for the discharge of the ten men should not be taken into consideration because certain alleged misconduct of the men was not reported to the general manager before he discharged them. Hence the trial examiner concluded that the real reason for the discharges was the union activity of the men. Apparently the Board approved this action. It said: "The Trial Examiner did not consider the evidence of the alleged misconduct of the discharged employees which was not reported to General Manager Adams or which allegedly occurred after their discharge, on the theory that such misconduct 'could have had no bearing upon the discharge.' In our opinion, however, such evidence is relevant in determining the remedy to be adopted. We have considered all of the testimony with regard to the alleged misconduct of these employees and find nothing in their behavior which would lead us to vary or deny the normal remedy of reinstatement with back pay."

■ The evidence, however, shows that the management was in receipt of sufficient information as to the actions of the seven men who were particularly engaged in closing the No. 9 mine on Monday to justify their discharge. These men were Paris Mullins, President of the Local Union, Elbert Lyons, Vice President, Charles Mabrey, Recording Secretary, Elva Rose and Swin Rose, members of the Grievance Committee, Harve Johnson and Ivan Rose. It is not disputed that all of these men except Mabrey were present at No. 9 mine when its entrance was blocked by the placing of the motor, and all except Mullins spent all or a part of the night at the entrance to the mine. Mabrey was a member of the Grievance Committee and was present during part of the day and until 11 o'clock at night at the entrance of the mine. It cannot be questioned that they were the leaders of the men and were reported as such to the general manager. It is immaterial that the details of their actions did not reach his ears for the undisputed evidence shows that they were party to the actions which constituted an unlawful interference with the company's property.

■ The management also discharged Ace Rudder, Hardaway Baker and Corbett Owens for alleged misconduct in connection with the closing of mines 7 and 8 on Tuesday, December 15. The evidence on the part of the Coal Company tended to show such misconduct, which included an interference with the entrance to the mine by the placing of a motor on the key switch, and that on this account these men were also discharged. The evidence of these men, however, was flatly to the effect that although they were present at the entrance to the mines on Tuesday morning, they had no part whatsoever in the placing of the motor or interfering with the entrance to the mine. Their testimony was accepted as true by the trial examiner and by the Board and consequently it cannot be said that the management had good cause for their discharge, especially as there were many miners present at the entrance to both mines who took no part in the disturbance but had come merely to look on or if possible to enter the mines in order to work.

■ It is unnecessary to inquire whether or not the conduct of the leaders of the disturbance may be correctly described as a wildcat strike or a sitdown strike. It is sufficient that it amounts to something more than a stoppage of work which the leaders began and in which they sought the cooperation of their fellow workmen. It amounted for the time being to a seizure of control of the mines to the extent that they could not be operated by the Coal Company or entered by other miners who were not interested in the strike and desired to enter the mines to work. It was held in National

Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 255, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, that the National Labor Relations Act does not undertake to abrogate the right of an employer to refuse to retain in his employ those who illegally take and hold possession of his property. See also, Hazel-Atlas Glass Co. v. N.L.R.B., 4 Cir., 127 F.2d 109; Standard Lime & Stone Co. v. N.L.R.B., 4 Cir., 97 F.2d 531. The same principle is applicable here. It is true that many of the incidents of violent resistance present in that case were fortunately absent from this. Here both parties conducted themselves with restraint. Early on Monday morning one of the miners, who was a preacher, addressed the miners at the request of the President of the Local Union and urged them to abstain from molesting the Company's property and from strong drink. On the other hand, the general manager of the mine deemed it wise not to use force to secure entrance into the mines but instructed the foreman not to run the risk of dangerous conflict by moving the motors against the will of the men. This temperate conduct on both sides doubtless made it possible to put an end to the disturbance within a relatively brief time.

It cannot be said that the management did not act within its rights. Disciplinary action was necessary in order that the company might secure possession of its property. The reason for the discharge was stated in the notices and there is no substantial ground for the inference drawn by the trial examiner that the men were discharged not because they took possession of the company's property but because the company desired to get rid of them on account of their previous union activities. The trial examiner went further in his conclusions when he held that the company discriminated against the miners in regard to the removal of the rock for the deliberate purpose of provoking a strike. The Board found it unnecessary to go this far, holding merely that the strike was caused by the unfair labor practices of the employer. But, even so the strikers were not justified in interfering with the Coal Company's possession of its own property and when they overstepped the bounds they furnished lawful grounds for their discharge.

These conclusions require a modification of certain of the provisions of the Board's order. Sections 1(a) and 1(c) of the cease and desist provisions are affirmed; but Section 1(b), which directs the employer to cease and desist from dominating or interfering with the administration of the Dante-Clinchco Independent Union, Inc., must be eliminated since there was no substantial evidence of such domination or interference on the part of the employer.

Section 2(a) of the affirmative provisions of the order, which directs the employer to withhold recognition from and disestablish the Dante-Clinchco Independent Union, Inc., and Clinchfield Employees Association, Inc., and Section 2(b) which requires the employer to reimburse each of its employees for all fees and dues deducted from his wages on behalf of Clinchfield from January 26, 1942 to July 16, 1942, must be eliminated. There was no substantial evidence of improper domination or interference with the Dante-Clinchco and the Clinchfield has already been disestablished and dissolved. Section 2(b) of the order was obviously based on the finding of the Board that the Dante-Clinchco was merely a continuation of and a substitute for Clinchfield with the Company's connivance and that therefore the Company had failed to comply with the terms of the settlement agreement of July 16, 1942 wherein the company had agreed to disestablish Clinchfield and to make certain payments to its employees. This provision must be eliminated because there was no substantial evidence to support the finding that the employer had not disestablished Clinchfield or had encouraged the Dante-Clinchco as its successor. The evidence indicates that the Company complied with the settlement agreement of July 16, 1942 and since that agreement made no provision for the return to the employees of the dues to Clinchfield checked off prior to July 16, 1942, there was no justification for the imposition of that provision in the present order.

Section 2(c) of the order must be modified so to eliminate the requirement that the employer offer reinstatement to certain employees, namely, Parils Mullins, Elbert Lyons, Charles Mabrey, Swin Rose, Elva Rose, Ivan Rose and Harve Johnson, whose discharge, as we have found, was justified by the evidence.

Sections 2(d) and 2(e) are affirmed insofar as they relate to other sections of the order as to which enforcement is granted.

Section 2(f) of the order, with respect to the posting of notices, must also be

changed so as to conform with the modification of the previous provisions of the order.

The decree of the court will direct the modification of the order in these particulars and its enforcement as so modified.

Modified and enforced.