## NATIONAL LABOR RELATIONS BOARD v. ILLINOIS TOOL WORKS.

### No. 8950.

Circuit Court of Appeals, Seventh Circuit.

Feb. 27, 1946.

Mozart G. Ratner, David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Morris P. Glushien, Dominick L. Manoli, and Mozart G. Ratner, Attys.,

National Labor Relations Board, all of Washington, D. C., for petitioner.

Alfred T. Carton, Erwin W. Roemer, and James A. Velde, all of Chicago, Ill., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is a petition of the National Labor Relations Board for the enforcement of its order directing that the respondent cease and desist from unfair labor practices, rescind a rule regulating the conduct of its employees, make whole two of its employees for their losses resulting from respondent's discrimination against them, and post notices to this effect. Enforcement is resisted only upon the ground that the findings are not supported by any substantial evidence.

Respondent is engaged in the manufacture and sale of machine tools in Chicago, Illinois. Beginning in the summer of 1942 and extending into May, 1943, it employed about 2,000 men in its production unit. There were about a dozen foremen with the title of "general foremen," each of whom was the head of a department; about six supervisory employees with the title of "assistant to the general foreman"; and between 65 and 75 "assistant foremen." Late in 1942, Amalgamated Machine, Tool and Die Local 1114 of the United Electrical, Radio and Machine Workers of America initiated an active campaign to organize respondent's employees. The union distributed a bulletin inviting applications for membership and listing the names of 17 employees as members of the organization committee. Among those named were Thomas M. McKenna and Victor Marsich. Between September and November, 1942, there was a large influx of new members into the union, and the members began wearing their union buttons. Respondent learned of these activities, and during the late part of March, 1943, Russell M. Wicks, assistant to respondent's factory manager, Charles J. Irwin, sent for employee William Wasinger, who came to Irwin's office and was questioned about his attendance at a union meeting and as to the number of employees who had signed up. In April, 1943, general foreman Biemeck sent for six employees who worked under his supervision and asked them if they had joined the union, and when Spacko, an employee, informed Biemeck that he had signed a pledge card, Biemeck told Spacko he was foolish and asked him if he "thought it would do any good, do * * * [him] any good." About the same time assistant foreman Rowe told Marsich to stop talking union. It also appears that when McKenna requested Irwin to meet with a union committee, Irwin refused, and said that he would "not meet with any person to represent another person, but would meet only with individuals in connection with their own grievances."

In November, 1942, general foreman Mulder warned employees Marsich and Friedman not to engage in solicitation for the union at the plant at any time, and in January, 1943, he re-stated the ban with the warning that "any solicitation on company property meant instant dismissal." March 6, 1943, respondent posted a notice on a bulletin board in which it stated that "no collection of any sort will be permitted in any of the shop or office departments for anything except Community Fund, U. S. O., Red Cross, and the sale of tickets to employee affairs such as the company picnic, parties and athletic events," and in April, 1943, in another communication addressed to the employees, respondent enjoined the employees from engaging in "the solicitation of union memberships on the company premises and during working hours." When the employees sought to elicit a clarifying opinion as to whether this prohibition included solicitation during the employees' free time at the plant, respondent failed to resolve their doubts or make clear that there was no bar to solicitation during non-working hours. On the contrary, in a booklet distributed to the employees in May, 1943, respondent prohibited, under penalty of discharge and without limitation as to time, solicitation of any kind without the express permission of respondent's personnel manager. With the exception of Marsich, presently to be discussed, no one was ever discharged for violating the rule against solicitation.

The Board found that promulgation of the rule against solicitation on behalf of the union at the plant during non-working hours was unduly restrictive of legitimate union activities in violation of § 8(1), 29 U.S.C.A. § 158(1), and that respondent in violation of § 8(1) and (3) of the Act had engaged in a course of conduct whereby it had interfered with, restrained and coerced its employees in the exercise of the rights

guaranteed them by § 7 of the Act, 29 U.S.C.A. § 157.

█ It is true that an employer may promulgate and enforce a rule prohibiting union solicitation during working hours. It is also true that time outside working hours is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 157 A.L.R. 1081. In the case before us, the record does not reveal that the rule prohibiting union solicitation during non-working hours was necessary in order to maintain production or to preserve discipline at the plant. In such a situation, the rule was an unlawful restraint upon the rights of the employees to engage in concerted union activities. Republic Aviation Corp. v. National Labor Relations Board, supra, and National Labor Relations Board v. American Pearl Button Co., 8 Cir., 149 F.2d 258.

Respondent contends that the conduct of Wicks and Biemeck did not violate the Act because each testified that he did not intend to coerce the employees and because the record does not disclose that the employees were in fact coerced, and that Rowe's prohibition of union talk and Irwin's assertion that he would meet only with individuals in connection with their own grievances were not evidence of the Board's conclusion that respondent had violated § 8(1) of the Act.

█ In answer to these contentions it will be enough to say that this court, National Labor Relations Board v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540, has recognized that the test of interference, restraint and coercion under § 8(1) of the Act does not turn on the employer's motive or on whether the coercion succeeded or failed. Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 134 F.2d 240, and Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act. Indianapolis Power & Light Co. v. National Labor Relations Board, 7 Cir., 122 F.2d 757; National Labor Relations Board v. Jahn & Ollier Engraving Co., 7 Cir., 123 F.2d 589; Reliance Mfg. Co. v. National Labor Relations Board, 7 Cir., 125 F.2d 311; National Labor Relations Board v. Aluminum Goods Mfg. Co., 7 Cir., 125 F.2d 353; National Labor Relations Board v. William Davies Co., Inc., 7 Cir., 135 F.2d 179. We conclude that the Board was justified in holding that respondent had engaged in a course of conduct whereby it had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed them in § 7 of the Act, 29 U.S.C.A. § 157.

## The Discharge of Marsich.

Respondent contends that Marsich was discharged because he had engaged in soliciting union members during working hours.

Marsich was discharged on April 30, 1943. He entered respondent's employ in January, 1937, and was one of the most skillful and experienced employees in the cutter department where he worked as a lathe operator. Marsich joined the union in 1942 and became one of its most outspoken and active members. He solicited memberships at the plant and on various occasions distributed union leaflets near the plant. In November, 1942, as we have noted, he was appointed a member of the union's organizing committee and subsequently became one of the union's stewards. Shortly after respondent learned of Marsich's membership on the union's organizing committee, foreman Mulder warned him not to engage in union activities at the plant and that if he were caught he would be discharged. In April, 1943, he served on a committee which sought to meet with respondent to discuss the discharge of a fellow union member. April 30, one Kraus, whose duty it was to lubricate the machines, stopped at Marsich's lathe and while he poured a lubricant into the lathe, he spoke to Marsich. Marsich asked him if he had signed a union card. Kraus replied that he had not, that he was merely a laborer and did not believe that the union would benefit him. Later that day, after one Benker had notified Irwin that Kraus had stated to him that Marsich "is always after him to join the union, he was after him again this morning," Irwin directed that Marsich be let go, and toward the close of that day Mulder notified Marsich that he was being discharged because he had engaged on that day in soliciting union membership. Marsich denied the charge, said it was unfair, that he was not guilty, and asked Mulder and Irwin to call in the

individual whom he had allegedly solicited. His request was not granted. Kraus did not testify. He died before the hearing. May 13, 1943, Marsich secured employment elsewhere, and at the hearing he testified he did not desire to be re-instated to his former employment with respondent.

The Board found that Marsich was discharged because of his union membership and legitimate union activities in violation of § 8(3) of the Act, and ordered that he be paid from the date of his discharge to May 13, 1943. We cannot say that the conclusion of the Board that Marsich's discharge was for union activity was not based on substantial evidence.

### The Lay-Off of McKenna.

In March, 1943, the union distributed at the plant a bulletin listing rates of pay which the union claimed it had procured for the employees of two other companies. A plain reading of the bulletin discloses clearly that its purpose was not to induce the employees to leave respondent's employ to secure better wages elsewhere, but to join the union so that through it the employees might secure better wages from respondent. Irwin challenged the accuracy of the rates of pay quoted, claiming that publication of the figures had "disrupted the morale" of the employees and that "the union ought to tell them they made a mistake." McKenna was a member of the editorial committee of the union bulletin. He and the other editors decided the format of the bulletin and which companies' rates should be included, but the rates themselves were supplied by one Baer, the union organizer, who was in a position to know the facts. McKenna at that time was unaware of the existence of any inaccuracy. McKenna agreed to print a correction if, upon investigation, the union found that the figures were inaccurate. The specific wage rates in the competing plants, it is true, were inaccurately set forth, but there is no claim that the two shops whose wage rates were quoted are not similar to respondent's. April 28, McKenna reported to Irwin that the union had ascertained that some of the figures were inaccurate and that it would publish a correction shortly. On May 4, when the union distributed another bulletin and it did not contain the corrected wage rate, McKenna was laid off. May 6, the union published the correction and on the following day McKenna was recalled. In the bulletin of May 6, in which the corrected rates were published, the union again published as a fact that the rates at the two competing plants were higher than those prevailing in respondent's plant.

The Board found that respondent's action in laying off McKenna constituted interference, restraint and coercion within the meaning of § 8(1) of the Act.

Respondent contends that McKenna was laid off for his participation in a wrong against respondent and for his failure to keep his agreement to correct the wrong. The argument is that McKenna committed a tort for which respondent would have been justified in discharging him, National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, and that the lay-off in legal effect was a compromise of its claim against him.

To compromise is to adjust and settle by mutual agreement. Obviously there can be no merit in the argument that the lay-off was a settlement of the claimed tort, since the indispensable element, i.e., mutual assent to compromise, is lacking. We note, moreover, that no contention was made before the trial examiner or before the Board that it had been libeled. It is here, for the first time, that respondent seeks to raise that question, and no showing has been made that there are any extraordinary circumstances excusing such failure. In such a situation, we think respondent is foreclosed from presenting the question, Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744. But be that as it may, we have concluded to further discuss respondent's contention.

In its brief, counsel for respondent admits that the printing of the bulletin involved a union activity, but it is claimed that in laying off McKenna respondent was not interfering with his right to engage in union activities under § 7 of the Act. With this contention we cannot agree.

We believe, as petitioner argues, that courts have recognized that a distinction is to be drawn between cases where employees engaged in concerted activities exceed the bounds of lawful conduct in "a moment of animal exuberance" (Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200) or in a manner not activated by improper motives, and those flagrant cases in which

the misconduct is so violent or of such serious character as to render the employee unfit for further service, Cf. National Labor Relations Board v. Fansteel Metallurgical Corp., supra, and Southern Steamship Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246, and that it is only in the latter type of cases that the courts find that the protection of the right of employees to full freedom in self-organizational activities should be subordinated to the vindication of the interests of society as a whole. No such situation is presented here, since the basic interest which respondent seeks to protect is not its right to be free from violence or some equally serious infringement, but rather its interest in having the employees remain nonmembers of the union. In such cases it is the function of the Board to weigh the conflicts which arise from time to time out of the exercise of those rights and to determine in each case whether the interest of the employees or the interest of the employers should be held paramount, see Republic Aviation Corp. v. National Labor Relations Board, supra.

In our case the Board weighed the conflicts between respondent's interest in "a truthful representation of facts" and the employee's interest in publication of union literature free from employer's interference, and concluded that the latter interest must prevail. Under this state of the record we see no justification for a reversal of the findings on which the Board's conclusion was based.

The petition of the Board is granted and a decree enforcing the order will be entered.