NATIONAL LABOR RELATIONS BOARD v. PERFECT CIRCLE CO.

PERFECT CIRCLE CO. v. NATIONAL LABOR RELATIONS BOARD.

Nos. 9288, 9289.

Circuit Court of Appeals, Seventh Circuit.

June 19, 1947.

---

[1] In this respect the case differs from United States v. Jones, 2 Cir., 162 F.2d 72.

MINTON, Circuit Judge, dissenting.

———◆———

Gerhard P. Van Arkel, A. Norman Somers, William Feldesman, Morris P. Glushien, and Fannie M. Boyls, all of Washington, D. C., and Robert Silagi, of New York City, for National Labor Relations Board.

T. C. Kammholz and Henry M. Thullen, both of Chicago, Ill., and Clyde Hoffman, of Hagerstown, Ind. (Pope & Ballard, of Chicago, Ill., of counsel), for Perfect Circle Co.

Before EVANS, SPARKS, and MINTON, Circuit Judges.

EVANS, Circuit Judge.

These two petitions challenge and defend the propriety of an order of the National Labor Relations Board, which was entered in a dispute over the discharge of four employees of the Perfect Circle Company. The dispute is highly factual and while not complicated, is apparently incapable of ami-

cable settlement, desirable as such a disposition would be.

The Board has ordered the Company to reinstate four employees who the Company contends were discharged for having illegally barred the plant manager from the plant during a strike.

The Board found the four employees were engaged in peaceful picketing, and employed no threat of violence, and therefore were not guilty of unlawful acts such as might be the legitimate basis of a discharge.[1] The Company, on the other hand, earnestly contends that the picketing was not peaceful, and that its manager was barred from the plant by threat of violence and intimidating action on the part of the four discharged employees.

The Company has petitioned us to review the Board's order, and the Board has petitioned us for the enforcement of its order. The order of the Board was made upon the Board's adoption of the trial examiner's intermediate report, and his findings.[2]

The Company is engaged in the manufacture of piston rings and gray iron castings. The New Castle plant of the Company employed about five hundred employees. Its sales for the plant for the year exceeded a million dollars.

The Examiner stated that "there is no suggestion that other than a harmonious and stable relationship" existed prior to the strike. The strike was "spontaneous" and "about 3:30 in the afternoon of August 27, a picket line formed before the plant entrance." Two draftsmen who had left the plant that afternoon on business were not permitted to re-enter the plant upon returning.

On the next morning, the 28th, the incident occurred which supplies the factual basis for these proceedings. The plant manager, Richard Bancroft, accompanied by the plant engineer, came to work. As he approached the gate to pass into the plant, employee Emerson hurriedly walked to the gate and placed himself between Bancroft and the gate, Emerson's body covering part of the gate. His arm was somewhat, but not fully extended. It is probable that at least two other employees also hurried to the site and stood either immediately before or behind Bancroft. There then followed conversation between Bancroft and the employees, and Bancroft and the chief of police, regarding Bancroft's entering the plant. These statements are in some dispute. At least there is not complete accord as to the exact words spoken. We quote several of them in the margin (of page 569). The employees in substance state they asked Bancroft "Please, Dick, don't go in." Bancroft insists there no "please" in their statement to him.

Rather, he was directed not to go in. Bancroft then turned to the Chief of Police and asked him to open the gate, but the Chief refused to do so, stating he could not do so.

█ There was no actual violence. Whether there was threat of violence is a point upon which the parties differ. The plant manager probably believed there would be violence and he therefore desisted in his attempt to enter the plant. He had, of course, the clear legal right to enter the plant. Any forceable obstruction to his exercise of his right was unlawful. If the employees unlawfully resisted Bancroft's right to enter the plant, the company was within its right in discharging the obstructing employees. If lawfully discharged, the Board erred in ordering their re-employment. The determinative issue, it will thus be seen, becomes an extremely narrow one.

The pickets, the four discharged employees, on the other hand testified to positive instructions that no violence was to be used[3]; also that no threat of violence was made. In fact, they were merely exer-

[1] National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Clinchfield Coal Corp., 4 Cir., 145 F.2d 66, 155 A.L.R. 874; National Labor Relations Board v. Indiana Desk Co., 7 Cir., 149 F. 2d 987.

[2] "The Trial Examiner found that the four employees in question did not debar Bancroft from the plant under threat of violence and that the respondent did, in fact, discharge these employees because they had engaged in a lawful concerted activity protected under the Act. We agree with these findings."

[3] Testimony of Hester New, President of the Local; Edwin Lye, Howard Emerson, Carl Batchford, and Raymond C. Brown, all employees of the Company.

cising their right to use persuasion to support their cause.

The Company places strong reliance upon the fact that though its discharge was predicated upon unlawful picketing and the Board found the picketing to have been lawful, the Company's bona fide action exonerates it from any charge of discrimination against unionism in violation of Sec. 8(3) of the Act, 29 U.S.C.A. § 158(3). Its position is stated in the Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 631, as follows,—

"We do not lose sight of the fact that our inquiry is centered upon the motivating cause of the employer's action. The task is a difficult one. It involves an inquiry into the state of mind of the employer * * *. We do not find substantial evidence to support any illegal motive such as is proscribed by Section 8(3) of the Act."

The Board counters with the contention that "Good faith belief by the employer that employee conduct is not protected under the Act does not relieve the employer of responsibility for the discriminatory discharge of employees engaged in such protected conduct." (Republic Aviation Corp. v. N. L. R. B. and N. L. R. B. v. Le Tourneau Co. of Georgia, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 372, 157 A.L.R. 1081; N. L. R. B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811; Home Beneficial Life Ins. Co. v. N. L. R. B., 4 Cir. 1947, 159 F.2d 280, and Matter of Mid-Continent Petroleum Corp., 54 N. L. R. B. 912.)

In N. L. R. B. v. Illinois Tool Works, supra [153 F.2d 814], this Court said

"In answer to these contentions it will be enough to say that this court * * * has recognized that the test of interference, restraint and coercion under § 8(1) of the Act *does not turn on the employer's motive.*"

In Republic Aviation Corp. v. N. L. R. B., supra, the discharge of an employee for violation of a company rule against solicitation, which rule was invalid as applied to the union solicitation in which the employee engaged on his own time, was discriminatory within the meaning of Sec. 8(3) of the Act in that it discouraged membership in a labor union, notwithstanding that the rule was enforced impartially against all solicitors. In that case the Court said [324 U.S. 793, 65 S.Ct. 984],

"The discharges of the stewards * * * were found not to be motivated by opposition to the particular union, or we deduce, to unionism." "The Board determined that there was no union bias or discrimination by the company in enforcing the rule."

The Court added

"It seems clear, however that if a rule against solicitation is invalid as to union solicitation on the employer's premises during the employee's own time, a discharge because of violation of that rule discriminates within the meaning of Section 8(3) in that it discourages membership in a labor organization."

Notwithstanding the language of these cases from which a rule of law may be deduced, the controversy remains a factual one. We therefore at the sacrifice of brevity, quote the evidence.[4]

---

[4] Evidence re threat of violence:
Edwin Lye (employee):
"Q. * * * Mr. Lye, would you * * * describe accurately what took place as Mr. Bancroft arrived there at the plant: * * * A. * * * About 9:00 o'clock in the morning Mr. Bancroft, or Dick * * * drove up in his car and parked approximately 15 feet from the gate with * * * Juday in the car. Mr. Bancroft got out of the car * * *. Dick walked up to the fence, and while he was walking up there I walked up; Don Long, the chief of police, walked up; Luther Thrasher and Howard Emerson also walked up. I walked up to the fence and turned around, facing Mr. Bancroft. Mr. B. was right directly in front of me. * * * Emerson and * * * Thrasher was directly behind him. * * * Long, * * * stood at my left side, and I said 'Please, Mr. B., don't go in.' With that, Mr. B. turned to * * * Long, * * * and said, 'Don, open this gate for me.' And * * * Long says, 'Mr. B., I can't open that gate for you.' With that Mr. B. turned around and went back to his car and got in it and drove away pretty fast, * * *.

"Q. The gate was closed, you state? A. Yes, sir.

"Q. Would you have let Mr. B. enter the gate if he so proceeded? A. Yes, sir.

"Q. * * * Would you say your conversation with Mr. B. at this gate was

The cases which hold we are bound to accept the Board's findings when supported by substantial evidence are many. The reasons for these holdings may be found in the provisions of statute (29 U.S. C.A. Sec. 160(e) ) and so we are told, in the superior qualifications of the Examiners and the members of the Board to pass upon the factual questions arising out of labor disputes. In N. L. R. B. v. Waterman S. S. Co., 309 U.S. 206, 208, 60 S.Ct. 493, 495, 84 L.Ed. 704, it is said

---

friendly or hostile? A. It was friendly, yes, sir. * * *

"Q. Did you at any time, Mr. Lye, tell Mr. B., 'You are not going in, that's final'. A. No, sir."

Roy Catron (employee):

"Q. All right. Were you there at the gate when Mr. B. approached, * * * A. No, I wasn't. I was at home."

Howard Emerson (employee):

"He (Mr. B.) drove up there next to the gate, and * * * Lye and * * * Thrasher and myself and the chief of police walked up towards the gate too, and Dick got out of the car and Ed said to him, 'Please, Dick, don't go in.' * * * Dick Bancroft turned to Don Long and says, 'Chief, unlock the gate. Open the gate.' He says, 'I can't. You will have to go in yourself.' * * *

He clumb in his car and drove away. "Q. Mr. Emerson, how many men were on the picket line the morning of August 28? A. * * * 15 or 20."

Carl Batchfield (employee):

"I was standing * * * and he (Mr. B.) and * * * Juday drove up and parked about 15 feet from the gate * * * and while he was getting out of the car, why, three men walked over towards the gate and they were * * * Lye * * * Emerson and * * * Thrasher. Well, by the time he got there in front of the guardhouse, why, they were there too and he stopped there in front of Edwin Lye, and Thrasher and Emerson stood behind him, and at the same time, why, Don Long walked from out there in the parking lot over to the gate. * * * I was too far away to hear anything, * * *."

Joseph Burden, employee.

"I can tell what I saw * * * because I wasn't close enough to understand what they were saying * * *. Dick came in 27th. He passed me and he turned around the corner of the fence toward the guardhouse, * * * I saw him walking up there, and * * * Lye and Don Long was walking * * * towards the gate and * * * Thrasher and * * * Emerson was behind them and Eddy, he went up and stopped next to the guardhouse and on that side of the gate, and Don Long on the other side, * * * I thought he was going in the gate, and then they talked together * * * I couldn't understand what * * * and then they went on away * * *."

Richard Bancroft, plant manager.

"Q. Did you have a telephone conversation with Ed Lye on August 27 * * * A. Yes, that was Monday afternoon. * * * Ed called me and said that from that time on all management was to stay out of the plant. No one would be permitted in except * * * the maintenance man * * *, and I said, 'Does that mean me too, Ed?'" And he said, 'Yes.'

"Q. What happened after you got onto the Company property * * * A. Well, I * * * proceeded * * * toward the gate. As I did this several people ran away from the street line toward the gate. * * * I called to the guard to open the gate because I was afraid I wouldn't get there first before these fellows (latter clause was stricken). * * * Emerson got there first. He put his back up against it so that I couldn't get at the latch and put his arm across the gate. He said, 'You are not going in there,' and almost that quickly * * * Lye arrived at the scene and placed himself adjacent to Emerson halfway facing Emerson, halfway facing me, so that I was further blocked from the gate. They said, 'Dick, you are not going in here.' And I said, 'Ed, I've got every right in the world to get in that plant. Now let me in.' He said, 'You are not going in and that's final.' * * * In the meantime two more men had come up, whom I didn't recognize * * * They closed in on me from the right and behind until I was in the midst of the group at the gate. I don't recall that they said anything. There was a general muttering, 'You can't get in there.' I know what the other two said. * * * Seeing that I couldn't get in I turned and beckoned to the chief of police who stood some piece distant beside the police car. I said, 'Don, come over here.' * * * So he walked over to the group at the gate, and I said, 'Don, open that gate and let me in.' He said, 'Dick, I can't do it.' I said, 'Why not?' He said, 'Well, things have changed a little and there is some confusion about WLB regulations. * * * I said, 'Well, Don, you are wrong. I have got a lawful right to go in that plant as manager.' He says, 'Well, I am sorry. I can't let you

"* * * In that Act Congress provided, 'The findings of the Board as to the facts if supported by evidence, shall be conclusive.' It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review

---

in.' I said, 'Well, I am sorry too.' And I got in the car and drove off.

"Q. Why didn't you proceed at that time to open the gate and walk into the Company premises? A. Well, I would have had forcibly to remove from my path * * * Emerson and * * * Lye with the assistance of the other two, and I figured that I was outnumbered four to one, and that was too much for me, and besides, I didn't want any violence. Their action was hostile and unfriendly.

"Q. At the time and place * * * did * * * Lye say to you at any time, 'Please, Dick' or 'Please, Mr. B., don't go in?' A. No, no pleases.

"Q. Did anyone use the word 'Please'? A. No. * * * He was squarely against the gate with his back and his arms stretched across it (Emerson). * * * he was scowling and determined and energetic. A formidable appearance, I'd say.

"Q. Did he say any threatening words to you? A. No. The tone of his voice was threatening.

"Q. * * * Did Lye talk in a loud voice or a low voice * * * A. Well, we were both a little excited, Mr. Examiner, and I think it tended toward the loud side. * * * This was a dramatic incident, it occurred fast. I got out of the car and walked rapidly to the gate. They had to run. Everyone was at high pitch. Under those circumstances, things are a little loud."

Allan Fromuth, personnel manager:

"Mr. B. drove up in his car * * * several men ran toward the gate. * * * Mr. B. * * * hurriedly walked toward the gate. Before he reached the gate, however, Mr. Emerson was there first and placed himself in front of the gate with one arm on the gate. Almost instantaneously Mr. Lye arrived at that spot and placed himself between Mr. B. and Mr. Emerson. * * * Thrasher came into the group * * * and there was another man there along with the group. They sort of formed a half semicircle around Mr. B."

Chesley Juday, plant engineer:

"* * * I observed two men * * * hurry across toward the gate. * * * As Mr. B. approached the gate Mr. Emerson took a position in front of the gate with his back to the gate and shortly thereafter, Mr. Lye walked up and took a position slightly in front and to the left of Mr. E. * * * I heard Mr. Emerson tell Mr. B., 'You can not go in there. * * * I also heard, when Mr. Lye walked up, he also made the statement to Mr. B., 'You are not going in there' and Mr. Lye repeated that statement more than once. * * * I remember Mr. B. telling Mr. Lye that he was * * * 'plant manager and I have a right to go in that plant.' I would say Mr. Emerson was excited and his face was rather tense. I don't know whether this is permissible to say, but then it was my impression that Mr. Emerson was ready to grab Mr. B.

"Q. Now, don't you remember that Ed Lye said to * * * B., 'Please Dick don't go in'? A. In fact, I am positive there wasn't any statement like that. * * *

"Q. On the basis of everything that you heard and observed with reference to the group congregated at the gate that morning, do you have an opinion as to whether Mr. B. would have been forcibly kept out of the property if he had proceeded? A. My opinion is that he would have been, definitely."

Victor Howell, foreman:

"* * * just before Dick got to the gate Emerson beat him there by just an instant. * * * Lye got there almost as B. did."

John Riggs, Policeman:

"As he (Bancroft) walked up to the gate there was about two or three fellows standing there at the gate. One of them * * * was standing there with his hand in the fence like that and as Mr. B. walked up there, why he just took his hand down * * *."

Donald Long, Police Chief.

"I heard Mr. Lye say, 'Please don't go in, Mr. B.' And Mr. B. turned to me and he said, I forget whether it was Long or Don. 'Are you going to open that gate so I can go in?' * * * I said, 'I'm sorry, Mr. Bancroft, I can't do a thing.' * * * I mean that Mr. B., if he had gone on and unlocked the gate, he could have gone on in.

"Q. If he had unlocked the gate? A. Or opened the gate, he could have gone on in. * * *"

of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act. * * *."

The Board in the instant case accepted the Examiner's report which so far as it dealt with the determinative issue in this controversy reads

"The undersigned finds that attempts to persuade others not to enter the struck plant when unaccompanied by violence or threats of violence, fall well within such limits. Since picketing is a normal and customary concerted action in support of a strike, it follows that picketing if lawfully conducted is a protected activity within the meaning of Section 7 of the Act."

He also found

"While an inference may be drawn that Lye proposed to prevent management personnel from entering the plant, it does not follow that he proposed to do so by other than peaceful and persuasive means."

■ We must accept this finding of fact, though contrary to what our finding would have been if the issue was one for our decision.

We are somewhat at a loss to understand how the Examiner or the Board could find that the four employees on a strike who stepped before the superintendent and barred his way into the plant did so with no intention of preventing the employer's entry into the plant. Nor can we see wherein the Examiner was better qualified to pass on the action which the four would have taken, had B. attempted to go through the gate, than we are now.

The less said about the policeman's action and his testimony is the most charitable course we can take. It could hardly be said that his testimony in the light of his previous action, was favorable to the side for which it was offered.

Could it be said the Examiner's greater familiarity with labor problems made his deductions more intelligent than ours? The Examiner thought the pickets were merely exercising their right to picket the premises peacefully. By peaceful picketing it was meant that they intended to present only oral argument but did not intend actually to resist the manager's entrance. In other words, when the striking employee, Emerson, ran to the gate, and placed himself between B. and the gate, he was merely presenting the striking employees' argument to the plant manager.

Our contrary view must give way to the Examiner's in view of the statute, and the holdings of the Supreme Court.

In other words, we bow to the command of the statute and to the decisions of the Supreme Court. If the disposition of this appeal turned on the findings above-quoted, we would grant the Board's petition for an enforcement order.

We are satisfied, however, that such disposition can not be made. Our acceptance of the Examiner's findings leaves a question of controlling importance unmet and undisposed of.

■ It is not the disputed intention of the four men that is determinative. It was the obstruction of the entrance to the company's property to the manager which constituted the four discharged men's misconduct.

Whatever their motives or intentions may have been, they barred the management out of the place. The Board's counsel admits frankly, "when in the course of a strike or other collective action, individual employees or groups of them seize their employer's property, the Act provides them with no shield from a discharge based upon their unlawful activity." National Labor Relations Board v. Fansteel Corp., etc., supra.

■ We are holding that the forceable denial of the employer's right to go upon its property is the equivalent of a seizure of the employer's property. The seizure of the employer's property as stated in the Fansteel case, supra, is a bar to reinstatement, because it denied to the employer his right to occupy his own property. The same effect is accomplished when the employee prevents the employer from entering upon his property.

The discharged employees in this case prevented the entry upon the employer's property. The effect of such action does not turn on whether the employees intended to yield if the employer persisted. The legal effect of such action is not lessened even though employees intended to use only oral argument against the manager's entry. *This is a case where the striking employees prevented the company's manager from entering the property.* Such prevention may be accomplished by physical force or violence; "by beating the manager up," or it may be accomplished by the employees' so conducting themselves that the manager is unwilling to take the risk of being "beat up."

The evidence in this case conclusively establishes that the four men did actually prevent the company's manager from entering the property. To this action we must give the same legal effect as if they had used physical violence to prevent the entry.

It is inconceivable that the law should require the employer to take the chance of physical violence or even death in order to secure possession of its property. The right of the employer to the possession of its property was clear. The employees abridged that right. They kept the employer out of its property. The effect of their action must be judged by the results. Had the manager taken his chance of trying to force his way through the gate he might have suffered violence which in turn could have aroused heated blood on his part with the result there would have been blow for blow. Must the employer in order to get possession of his property take a chance with the life of the manager? We think not.

In short, the motive of the wrongdoer is not the controlling and determining factor in this and similar cases. The employer may not avoid the consequence of its interference, restraint and coercion, whatever may be its motive (N. L. R. B. v. Illinois Tool Works, 7 Cir., 153 F.2d 811; Republic Steel Corp. v. N. L. R. B., 3 Cir., 107 F.2d 472). Nor may the employees avoid the consequences of their action in barring the employer from his plant even though they were engaged in picketing the plant. The employees' right peacefully to picket the plant is clear. This right may not be exercised, however, to the extent of excluding the employer from his property. Motives (or good intentions) of the employee, like motive of the employer, can not excuse unlawful conduct, either by employer or by the employees.

We conclude from the uncontradicted evidence in this case (and no adverse finding of the Examiner avoids this conclusion) that the employer sought possession of its property; it was denied that possession by the four discharged employees; the employer was justified in its belief from the words and acts of the discharged men, that it could not get possession save through a fight, that in a fight it was represented by one man and the striking pickets had four; that it was not required to take the chance of bloodshed before it could discharge those who unlawfully obstructed its entry into its own plant.

Finally, the order of the Board reinstating the four employees can not stand.

The petition of the Board to enforce its order is Denied.

The petition of the employer to vacate the Board's order is Granted.

MINTON, Circuit Judge (dissenting).

It seems to me that the majority opinion takes inconsistent positions. First, it is found in the opinion that the picketing was peaceful. The evidence before the Board was conflicting on this point, but the Board found that the picketing was peaceful, and there is an abundance of evidence to support this finding. It must have been with this in mind that the majority opinion of this Court found that the picketing was peaceful. The opinion then says: "We are holding that the forceable denial of the employer's right to go upon its property is the equivalent of a seizure of the employer's property" within the meaning of the Fansteel case. Assume that a forcible denial of entry to the property by the strikers would bring the case within the Fansteel doctrine. There is no finding of any such force. The Board found: "It is true that Lye stood partially between Bancroft and the gate but it is found that Bancroft was

574

not thereby barred from entering and it is further found that the attitude of Lye, Emerson, and Thrasher was not hostile or threatening."

This finding is completely at variance with the Court's finding, and the Board's finding has ample support by substantial evidence in the record. I set forth in the margin evidence from the record which clearly supports the Board's view.[5]

Bancroft gave a different version of the situation, which was in conflict with that of the strikers and the police. To support the Court's statement that the evidence conclusively establishes that the four strikers did actually prevent the company's manager from entering the property, the Court has to accept Bancroft's version. This version the Board rejected. It accepted the version of the strikers and the police.

Notwithstanding the fact that the Board's finding is supported by substantial evidence, the Court disagrees with the Board on a resolution of that conflict in the evidence. We have no part in that conflict. We look only to the evidence which supports the Board's finding, just as we would a jury's verdict. The Board accepted the version

---

[5] Edwin Lye:

"A. * * * Mr. Bancroft got out of the car on one side. Chesly Juday got out of the car on the other side. Dick walked up to the fence, and while he was walking up there I walked up; Don Long, the chief of police, walked up; Luther Thrasher and Howard Emerson also walked up.

"I walked up to the fence and turned around, facing Mr. Bancroft. Mr. Bancroft was right directly in front of me. Howard Emerson and Luther Thrasher was directly behind him. Don Long, the chief of police, stood at my left side, and I said, 'Please, Mr. Bancroft, don't go in.' With that, Mr. Bancroft turned to Don Long, the chief of police, and said, 'Don, open this gate for me.' And Don Long says, 'Mr. Bancroft, I can't open that gate for you.'

"With that, Mr. Bancroft turned around and went back to his car and got in it and drove away pretty fast * * *."
* * * * * * * *

"Q. Did you or did you not have any orders to physically prevent any Company manager or Company official from entering the gate? A. I did have orders not to. * * *

"Q. Who told you that? A. Hester New, our commander of the picket line.

"Q. Would you have left Mr. Bancroft enter the gate if he so proceeded? A. Yes, sir. * * *

"Q. Would you say your conversation with Mr. Bancroft at this gate was friendly or hostile? A. It was friendly, yes sir.

"Q. Have you at any time ever physically kept any Company official out of the plant? A. No.

"Q. Have you ever threatened any Company official with bodily harm or any kind of threats if they should enter the plant? A. No.

"Q. To your knowledge, was there any violence of any sort on the picket line during the strike? A. No, sir. * * *

"Q. Have you at any time debarred the plant manager from access to the Company property? A. Only that I asked him not to go in the plant.

"Q. Have you at any time debarred the plant manager from access to the Company property under threat of violence? A. No.

"Q. Have you ever asked or ordered any individual to debar the plant manager from access to Company property? A. No.

"Q. Have you ever threatened to have the plant manager debarred from access to Company property? A. No. * * *

"Q. Did you ever see anyone debar plant manager from Company property? A. No.

"Q. Did you ever notify anyone connected with the Company that they would be forcibly prevented from entering the plant? A. No."

The evidence of employees Emerson and Batchfield and Chief of Police Don Long corroborate Lye in every particular.

Chief of Police Don Long testified in part as follows:

"Q. From your observations * * * will you state whether Mr. Bancroft's access to this gate was hindered by the physical location of Mr. Lye? A. Well, I—

"Q. Can you answer the question? A. I would say not. * * *

"A. * * * I would say he (Bancroft) wasn't being denied entrance. * * *

"A. I mean that he wasn't—what I am trying to say is that I mean, he wasn't being denied entrance to the factory by threats. * * *

"Q. Did he say 'Please, Mr. Bancroft, don't go in'? A. He definitely did say, 'Please don't go in.'

"Q. You are positive? A. I am very positive."

of the gate incident given by the strikers, who were corroborated by the police. There was no violence or threat of violence in this view of the evidence. The police saw no occasion for their interference and refused to intrude at Bancroft's request, and the latter turned on his heel and left hurriedly. My credulity as to the politeness and gentility of the picketing is stretched considerably, but I am not the trier of the facts. I have seen many verdicts of juries that seemed to me off the beam, but I have found no rule of law that permits an appellate tribunal to retry the facts. I submit that we are bound by the Board's finding, which is supported by substantial evidence, whether we like it or not.