**ADVANCE INDUSTRIES DIVISION-OVERHEAD DOOR CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 75–1914.**

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1976.

Decided Sept. 1, 1976.

Timothy K. Carroll, Detroit, Mich., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Eric Moskowitz, Michael S. Winer, Attys., N.L.R.B., Washington, D. C., for respondent.

Before PELL, SPRECHER and BAUER, Circuit Judges.

PELL, Circuit Judge.

The issues presented in this case by the petition of Advance Industries Division-Overhead Door Corporation (Company) for review of an order entered by the National Labor Relations Board (Board) and by the Board's cross-petition for enforcement of its order are 1) whether the Company violated sections 8(a)(3) and (1) of the National La-

bor Relations Act as amended by discharging three employees for picket line misconduct and 2) whether the Company violated sections 8(a)(3) and (1) of the Act by discharging five employees who refused to leave the plant when ordered to do so at the end of their shift.

In the fall of 1972, the United Brotherhood of Carpenters Local 2497 (Union) began an organizational drive among the Company's employees. After an election and appropriate proceedings, the Board's Regional Director certified the Union as the bargaining representative of the employees. The Company refused to bargain with the Union. The Union, therefore, filed unfair labor practice charges with the Board, and these eventually resulted in the Board entering an order requiring the Company to bargain. 207 NLRB 76 (1973). The Company filed a petition for review of that order with this court; but while it was pending, the Supreme Court decided *NLRB v. Savair Manufacturing Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). In accordance with a request by the Company and an order of this court, the Board reconsidered its decision in light of *Savair* and rescinded the certification. 214 NLRB No. 79 (1974). To complete the history of these events, although it is not relevant to this review proceeding, another election was held and the Union failed to achieve a majority.

In the period between the Board's decision ordering bargaining and its rescission of that order, the Union called a strike to attempt to force the Company to bargain; and on July 23, 1973, about 80 of the Company's 150 employees went on strike. The strike failed to achieve its purpose, and on August 27 the employees voted to return to work.

On being informed of this, the Company sent telegrams to most of its employees indicating that in the event they wished to return to work, they should report for their regular shifts on August 31. The Administrative Law Judge (ALJ) found that the Company had the employees start work on August 31, the last working day before Labor Day, so that they could be eligible for holiday pay. The Company had a rule that employees would only receive holiday pay if they worked the day before and the day after a holiday. Because of the preparations required, it was not feasible for them to return earlier.

The Company denied reinstatement of Darlene Romenesko, Betty Koester, and Vicki Marheine because of picket line misconduct. During the strike, nails were sprinkled on the plant driveways, plant windows were smashed, and lights on poles on the plant grounds were damaged.

On July 27 Romenesko arrived at the plant in a camper type vehicle about 8:30 in the evening. The ALJ found:

> The driver of the camper parked it in a space opposite respondent's buildings. Romenesko crossed the road separating her camper from the plant and walked toward the center light. When she came to the center light pole Romenesko drew a hand gun, which until that time had been concealed under her jacket, crouched down and aimed the gun at the light. After maintaining her position for a minute or two she replaced the gun under her jacket, recrossed the road, and handed the gun to her son. Throughout the entire episode just recounted no sounds were heard of a gun being fired or of glass being broken.

> It is reasonable to assume that had Romenesko actually fired the gun the sound of its firing would have been heard. It is likewise reasonable to assume that had Romenesko fired the gun and had its projectile found its mark the sound of glass breaking would have been heard.

> This being so, I find that although Romenesko aimed a hand gun at the light, she did not actually fire it. I further find that the evidence does not affirmatively establish that Romenesko was in any way involved in the light's breakage, which I have earlier found occurred before 7:30 p. m. on the day in question. [Footnotes omitted.]

The Company argues that the ALJ erred in finding that the gun was not actually fired because the evidence showed that the gun was a pellet gun, which would make little, if any, noise and because the sound of breaking glass would not have been heard because only a plastic shield remained, the glass lamp having been broken earlier. While this argument is not without persuasiveness, this court need not decide whether the findings of the ALJ on this matter, later adopted by the Board, were supported by substantial evidence because of the legal conclusions we draw from the facts as found by the ALJ. Therefore, for the present purposes we will assume she did not fire the gun.

On August 6 Marheine and Koester were on picket duty. The ALJ found that one or both of them threw gravel at a non-striking employee's car, chipping the paint. On August 14 someone in a group of eight strikers, which included Koester, threw gravel at a security guard. The guard yelled, "Who did that?" Koester then left the group, walked to one of the plant driveways where non-striking employees' cars were emerging, and pounded on one of the cars with her hand. From this action, the security guard inferred that Koester had thrown the rocks, but the ALJ credited Koester's denial because the guard's identification was based on conjecture, not personal observation. The ALJ also found that on August 24 Koester rocked a post installed to guide snow plow operators but that Koester did not damage the post.

Mary Blaese, Verlee Freimuth, Peggy Bennet, Bonnie Tullberg, and Rita Weber worked on the Company's second shift and were the only second shift employees who remained out for the duration of the strike. Prior to the strike, the second shift ran from 4:00 p. m. to midnight; but during the course of the strike, the times were modified so that the employees would work longer on four days of the week and shorter on Friday. About 8:30 p. m. on Friday, August 31, the first day after the strike, Linda Kersten, a management representative on the second shift, informed each of the five that the plant would be closing at 10:00. Tullberg, the second to be advised of this, told Kersten that she wasn't leaving at ten o'clock and that she wanted to work to twelve o'clock. During the course of the evening, the other four told Kersten the same thing. Bennet asked Kersten why the shift was being shortened, and Kersten answered that the non-striking employees would have worked their 40 hour week by that time. Kersten discussed the problem with David Vyse, another management representative on the second shift, and telephoned the plant's general manager, Victor Sumnicht. Both advised calling the police. Freimuth telephoned the Union business manager, Jerry Jahnke, from a pay telephone in the plant, informed him of the plans to close at 10:00, and expressed to him concern about a loss of the two hours wages and holiday pay. The ALJ found that none of the five explained this concern to Kersten or Vyse. Jahnke instructed Freimuth "to stay working [beyond ten o'clock] even though they turned the lights out ."

At 10:00 all of the second shift employees except the five ceased working and punched out. The five began to take a ten minute break which they normally took at that time. Kersten told them that the plant was closing and warned them that if they did not leave, their time cards would be punched out. The employees refused to leave. Kersten punched their time cards, and Vyse telephoned the police. About this time, Freimuth spoke to Jahnke who had stationed himself on the Company parking lot outside the employee lunchroom. He told them to go back and work. Meanwhile, the police arrived, and after talking with Kersten and Vyse, they, in the words of the ALJ, "requested, instructed, ordered, and in every conceivable way attempted to cause the individuals to leave the premises."

The remaining events of the evening as found by the ALJ are as follows:

While the police were importuning the Five to leave the plant, Freimuth, accompanied by a policeman and some members of the group, once more sought Jahnke's

advice. Jahnke told them, as Freimuth related "that he couldn't get any answers to the questions that he wanted," and again instructed them to "go back to work."

Being thus stiffened in their resolve not to leave the premises before midnight, the Five refused to depart voluntarily. In view of this, at about 10:45 p. m. they were arrested and removed from the plant.

The five were subsequently discharged.

The ALJ found that the Company violated the Act by refusing to reinstate Romenesko, Koester, and Marheine, because he did not find their picket line misconduct so egregious as to warrant the denial of section 7's protection. A panel of the Board agreed with the ALJ regarding these employees. The ALJ found that the Company did not violate the Act by discharging the five, but the panel disagreed and found that the Company violated the Act. Member Penello dissented regarding the five.

I.  Discharges for Picket Line Events

■ An employer may not refuse to reinstate strikers unless he can show that his action is due to legitimate and substantial business justifications. *NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). Picket line misconduct may be sufficient to warrant termination. *E. g., Firestone Tire & Rubber Co. v. NLRB*, 449 F.2d 511 (5th Cir. 1971). Trivial rough incidents or moments of animal exuberance must be distinguished from misconduct so violent or of such a serious character as to render the employee unfit for further service. *See Milk Wagon Drivers Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941); *NLRB v. Illinois Tool Works*, 153 F.2d 811 (7th Cir. 1946). While this distinction was originally drawn in another context, it has been applied to determine whether an employer has sufficient reason to deny an employee reinstatement. *Terry Coach Industries, Inc.*, 166 NLRB 560 (1967), *enf. per cur.*, 411 F.2d 612 (9th Cir. 1969).

■ Romenesko's misconduct was sufficiently serious to justify the Company in denying reinstatement to her. We need not decide whether some particular circumstances might warrant a striking employee displaying a handgun on or near a picket line. We find no such justifying circumstances claimed or existing here. Romenesko did not inadvertently bring the gun to the picketing scene. It was brought as a concealed weapon and then brought out into the open upon which she went into a crouching position and aimed the gun at Company property for a minute or two. Her actions could not have failed to direct attention to her and to what she was doing. The actions were openly performed in the picketing area of a plant which was not shut down but which was attempting to continue its operation with non-strikers. Word that strikers were armed could have a strong coercive effect on non-strikers; a striker's apparent willingness to use a weapon makes the effect even stronger. That this effect was not demonstrated to the ALJ is not relevant; the misconduct still occurred. We deny enforcement of the Board's order to the extent it applies to Romenesko.

■ The alleged misconduct of Koester and Marheine was not sufficient justification for the Company to deny them reinstatement. The ALJ's finding that the Company did not show either engaged in serious misconduct is supported by substantial evidence. The rocking of the post and a single incident of pounding on a car by Koester were not egregious incidents; or at least, the Board was acting within its authority in so finding, and it is the primary responsibility of the Board, not the courts, to strike the proper balance between asserted business justifications and employee rights. *NLRB v. Fleetwood, supra*. The ALJ noted, citing *Insurance Agents' International Union*, 119 NLRB 768, 773 (1957), *judgment of the court of appeals setting aside the order of the Board aff'd on other grounds*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), that he was bound by the Board's holding in *W. J. Ruscoe Co. v.*

*NLRB,* 166 NLRB 618 (1967), *enf. denied in relevant part,* 406 F.2d 725 (6th Cir. 1969), even though the Sixth Circuit denied enforcement to the Board's order. In *Ruscoe* the Board ordered the company to reinstate an employee who threw gravel at a supervisor taking photographs of other employees engaging in picket line misconduct. The Sixth Circuit denied enforcement to this order and stated: "This type behavior clearly lies outside that class of exuberant or impulsive conduct which the Board argues must be protected to carry out the policies of the Act." 406 F.2d at 727. This court is not bound by the Board decision, as was the ALJ; and we place no reliance on this portion of the ALJ's opinion, which was later adopted by the Board. The fact nevertheless remains that the ALJ found that the company failed to prove that Koester threw rocks at the supervisor or to prove that both were involved in throwing rocks at the employee's car. The Company only proved that one of the two threw the rocks but not which one. These facts provide an insufficient basis on which to justify discharging the two. We enforce the Board's order to the extent it applies to Marheine and Koester.

## II. Discharges for Events in the Plant

■ As recently restated by the Supreme Court in *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), employees' rights under the Act must be accommodated with private property rights with as little destruction of one as is consistent with the maintenance of the other. *Id.* at 4286. The locus of that accommodation may fall at different points along the spectrum depending on the nature and strength of the rights asserted in a particular context. The primary responsibility for making this accommodation rests with the Board.

■ Employees have the right to make limited use of their employer's property in the exercise of their rights. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). In the absence of established grievance procedures, they may stop work and approach their employer's representatives to present grievances. *NLRB v. Serv-Air Inc.,* 401 F.2d 363 (10th Cir. 1968); *NLRB v. Kennametal, Inc.,* 182 F.2d 817 (3d Cir. 1950). They may walk out even if they do not articulate their grievance if the company has reasonable grounds for knowing the basis of their action. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

A more complex problem is presented when employees stop work but refuse to leave the premises when requested to do so by their employer. *NLRB v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939), presents an extreme example of employee abuse of an employer's property rights. In *Fansteel* employees seized two of their employer's key buildings and occupied them for nine days. They were only evicted at that time by force. The Court stated:

> We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, which they would not have enjoyed had they remained at work.

*Id.* at 255, 59 S.Ct. at 496.

*Cone Mills Corp. v. NLRB,* 413 F.2d 445 (4th Cir. 1969), presents facts closer to the present case. In *Cone Mills* the employees stopped work in protest over the discharge of another employee. When told to return to work or leave the plant, they refused to do either until they were arrested or escorted from the premises. When one employee was told to leave, he stated that he was staying until the regular quitting time. In deciding that the employer did not violate the Act by discharging the employees, the court placed heavy emphasis on the failure of the employees to utilize an established grievance procedure. The grievance procedure in question had at one time been a part of a union contract, but there had been no contract for the previous three years. The parties, however, recognized the procedures as still in effect, except for the arbi-

tration provision. In *NLRB v. Pepsi-Cola Bottling Co.,* 449 F.2d 824 (5th Cir. 1971), *cert. denied,* 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972), the court found that the employer violated the Act by discharging employees who ceased working, went to the plant manager to protest the discharge of six other employees, and upon the plant manager's refusal to reinstate the six, sat down and refused either to return to work or to leave the plant. Before the end of the shift, the employer called the police; and upon request by the police, the employees left the plant and began picketing outside. The court found that the facts did not tend to show that the employees were holding the plant in defiance of the owner's right to possession, noting that the sitdown did not carry over into the next shift and that the employees left immediately when requested by the police. The court indicated that the employees' refusal to obey the employer's order to leave the plant was not dispositive because it served no immediate employer interest and unduly restricted the employees' right to present their grievances. The court distinguished *Cone Mills* on the ground that the employer interest in maintaining an established grievance procedure was not present in the case before it because there was no such procedure.

The other cases relied on by the Board are either factually distinguishable or add little to the law discussed above. None involved refusals by employees to leave after the end of their shifts. Specific grievances were presented in each. *Masonic and Eastern Star Home,* 206 NLRB 789 (1973), *enf.,* (D.C.Cir. May 30, 1975), 77 CCH Lab. Cases ¶ 10,883; *Olin Industries v. NLRB,* 191 F.2d 613 (5th Cir. 1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952); *NLRB v. American Manufacturing Co.,* 106 F.2d 61 (2d Cir. 1939), *modified & aff'd per cur.,* 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988. In *Masonic Home* the Board noted the absence of established grievance procedures and placed reliance on this factor. The courts in *Olin Industries* and *American Manufacturing* did not discuss the availability of grievance procedures, but it may be inferred that none were available.

Additionally, in *Masonic Home* the gathering of employees took place in a semi-public area, and on request they moved to an area which was not contiguous to any patients' rooms. The expressed reason for which the employees were fired was for not going to work, not for trespassing. In *American Manufacturing* the court upheld the Board's finding that the discharges were discriminatory against union personnel since some of the persons who did not return to work were not discharged.

■ We accept the basic facts as found by the Board, which are undisputedly supported by substantial evidence, but hold that the Board abused its discretion in applying the law to these facts to hold that the Company violated the Act by discharging the five who refused to leave the plant at the end of their shift. In contrast to the facts in *Pepsi-Cola* and in the other cases relied on by the Board, the employees presented no grievance to company representatives; they refused to leave after the end of their shift when ordered to do so by management representatives and the police, thereby preventing the employer from closing the plant for the night; and they had available an established grievance procedure through which they could have presented their complaints.

The Board's statement that the employees actively sought to present their questions to the Company's management presumably refers to the employees' demand that Sumnicht come to the plant; but the ALJ found that the employees did not make their questions known to the management representatives at the plant, and the Board did not find otherwise. The employees' refusal to leave the premises, their failure to express their questions to the management representatives present, and their demand that a management representative of their choice come to the plant at night, together in the context of this case, show a complete lack of respect for their employer's property rights. We do not believe Congress intended to countenance such actions.

The majority opinion of the Board refers to the effect of the early termination of the

shift, "which the employees reasonably assumed that action would have on their qualifying for holiday pay." Whether this was the belief entertained on the evening in question or was merely an afterthought, it is clear that concern about loss of holiday pay was not communicated to the supervisory personnel present at the plant. Further, we note that denial of holiday pay under these circumstances is strikingly inconsistent with the Company's special efforts to arrange for the return of strikers prior to the holiday so as to avoid a claim that the returning strikers were being unfairly denied holiday pay.

The Board discounts the grievance procedure available to the employees because it was established by the employer rather than through a collective bargaining contract, but the Board does not in any way indicate that the procedure was ineffective or a sham. We do not mean to indicate that an employer can prevent employees from expressing their grievances in any proper manner they see fit by unilaterally establishing a grievance procedure; but the existence of such a procedure shifts the locus of the accommodation between employees' rights and private property rights in favor of the employer under the circumstances of this case. The employees cannot justify their refusal to leave the plant when ordered to do so on the ground that they had no other method available to present their grievances. The court in *Pepsi-Cola* could not have been referring to the possibility of a union negotiated grievance procedure since the union in that case had only just begun negotiations at the time the sit-down strike occurred. In *Cone Mills* the grievance procedure to which the court referred was not one established by contract but rather one established at most by informal mutual consent of the employer and the employees. Had there existed a contractual grievance procedure containing a valid no-strike clause, such as the Board posited, the employees most likely would have been acting outside the protection of the Act had they merely walked out to express their grievances.

The Board errs in placing reliance on the Company's guidebook, which provides that the normal work day will consist of eight hours and that employees will be given notice prior to leaving work the previous day of any change in shifts. There is no dispute that the employees who had not been on strike had been given adequate notice of the shift change. The only reason that the five did not receive advance notice of the change was that they had been on strike when the shift was changed. The telegram directing the five employees to report to their regular shift if they wished to return to work could have, ideally, been more detailed; but this lack of specificity is hardly sufficient to excuse the employees' conduct.

We agree with the majority of the Board's panel when it states that it is clear that the Act would have protected the five if they had left the plant and formed a picket line outside, but we agree with dissenting member Penello when he states: "[T]he result reached by the majority and the proposition of law for which it stands are . . . wholly repugnant to the purposes of the Act."

## III. Conclusion

For the foregoing reasons, the order of the Board to the extent it applies to Marheine and Koester is enforced. The portion of the order which applies to David Lee, a portion which the Company did not contest either before the Board or before this court, is enforced. The Company's petition for review of the remainder of the order is granted and enforcement of the remainder of the order is denied. The Company's petition for review is denied as to Marheine, Koester and Lee.

Enforcement granted in part; enforcement denied in part.