ISLA VERDE HOTEL CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 82–1427.

United States Court of Appeals,
First Circuit.

Argued Feb. 8, 1983.

Decided March 14, 1983.

Rehearing Denied April 5, 1983.

COFFIN, Chief Judge.

Affirming the Administrative Law Judge ("the ALJ"), respondent National Labor Relations Board ("the Board") found that petitioner Isla Verde Hotel Corporation ("the Hotel") violated §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("the Act") by unilaterally cancelling payment of a Christmas bonus to its croupiers in December of 1979 and thereafter refusing to bargain about that cancellation; that petitioner violated §§ 8(a)(3) and 8(a)(1) of the Act by threatening employees with reprisals and by discharging and refusing to reinstate them for participating in a protected unfair labor practice strike; that petitioner violated § 8(a)(1) of the Act by requiring those discharged strikers to waive statutory rights in order to obtain reinstatement; and that petitioner violated §§ 8(a)(1), 8(a)(3), and 8(a)(4) of the Act by discharging and denying certain benefits to employee Felix Ramos because of his union activity, his testimony in Board proceedings, and his filing with the Board of an unfair labor practice charge. Following the recommendations of the ALJ, the Board ordered the Hotel to cease and desist from the above unfair labor practices; to bargain with the Union; and to reinstate and make whole employee Ramos and those striking employees who were discharged. The Hotel petitions to set aside the Board's order. The Board cross petitions for enforcement of the order. Because substantial evidence on the record as a whole supports the Board's findings, we enforce the order.

Rafael Buscaglia, Jr., Hato Rey, P.R., with whom Pedro Maldondo Silva, Hato Rey, P.R., was on brief, for petitioner.

Paul E. Bateman, Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Washington, D.C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

I. *The Christmas Bonus Strike*

A. *Background*

The croupiers in the Hotel's gambling casino were represented at the times relevant to this action by the Asociacion de Empleados de Casino del Isla Verde Holiday Inn ("the Union"). In early December of 1979 union representatives discussed with hotel management the acquisition of employee uniforms, the annual Christmas party, and the payment of a Christmas bonus. Apparently as a result of those discussions, the Hotel announced in a letter dated De-

cember 6 that uniforms would be supplied, a Christmas party would be held, and steps were being taken to pay a Christmas bonus to those entitled.[1]

After having originally planned to pay the bonus at the Christmas party on December 18, the Hotel's casino manager informed several employees at the party that the bonus would be paid on December 20 or 21. The Hotel apparently intended to pay the bonus at 8:30 p.m., when the shifts changed in the casino, on December 21. But on December 20 the Hotel received notice from the Puerto Rico Labor Relations Board that the Union had filed an unfair labor practice charge in another matter.[2] According to testimony credited by the ALJ, on the afternoon of December 20 the Hotel's personnel manager told the day shift union steward that the general manager of the Hotel was angry over the filing of a charge with the Commonwealth Board and was therefore not going to give the croupiers a bonus.[3] Learning of this intention, four union officers attempted to speak with the Hotel's general manager, who told them he had no time to talk with them and that they should talk to the casino manager. Having tried unsuccessfully to see the casino manager, the union officers resolved to stage a work stoppage if management did not give a bonus and refused to talk about it.

The casino manager, having become aware of the threatened work stoppage, conferred with the general manager. Believing that to give the bonus that night under pressure would be an undesirable precedent, they decided not to give the bonus that night, but to give the bonus the following day if the workers did not strike. The second part of their intentions was never, however, communicated to the employees. Instead, the assistant personnel manager called two of the union officers into his office and informed them falsely that there was to be no Christmas bonus and that the casino manager, whom they had persisted in attempting to see, had nothing to discuss with them. Encountering the casino manager subsequently, one of the union officers asked him if the bonus would be paid. The casino manager replied no, emphasizing his answer with a disparaging epithet.

The union officers then attempted to implement the planned work stoppage. They were thwarted, however, by supervisors who had been prepared for that eventuality and who, at the casino manager's order, relieved the croupiers of their duties at the gambling tables and ordered them to leave the casino. The croupiers complied and set up a picket line outside the hotel. The strike was joined the following afternoon, December 21, by the day shift croupiers.

On that same day, the casino management discharged those employees who had walked out the previous night and ordered the day shift employees to report to work, indicating that failure to do so would result in appropriate measures. A letter dated December 26 ordered day shift employees to report to work on December 28 on penalty of suspension. With one exception, none of the employees returned to work until the Union abandoned the strike on January 5. As a result of post-strike negotiations, the day shift employees were reinstated in mid-January and, some time later, all of the night shift employees were also reinstated with the exception of the three union officers who had led the strike. As a condition of their return, the night shift employees were required to sign a letter that included

1. Puerto Rico law requires employers who have had a profitable year to pay a Christmas bonus. The Hotel had paid a bonus in 1977 and 1978, but the record does not reveal whether those bonuses were compelled by law. There was some evidence presented to the effect that the Hotel had not made a profit in 1979.

2. The Union's charge alleged that the Hotel had refused to rotate days off as required by the collective bargaining agreement.

3. The personnel manager's testimony gave a quite different account of this conversation with the union steward. The ALJ found his testimony incredible in the context of subsequent events. Our review of the record persuades us that this and the other credibility judgments made by the ALJ are supportable.

a "voluntary" waiver of "any claim that ... [the Union] ... or any other person may be making on my behalf, both with the Agencies of the Commonwealth of Puerto Rico as well as the Federal Government."

### B. Refusal to Bargain

An employer's change of a term or condition of employment without notifying and conferring with the employees' collective bargaining representative constitutes an unlawful refusal to bargain, violating § 8(a)(5) of the Act. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Here there was substantial evidence that the payment of a Christmas bonus had been made a term of employment through promises and prior conduct. *See NLRB v. Laredo Coca Cola Bottling Co.,* 613 F.2d 1338, 1343 (5th Cir.1980). Bonuses had been paid in the previous two years, the payment of a bonus had been the subject of management discussions with collective bargaining representatives, and management had subsequently announced that a Christmas bonus would be paid. When informed that a bonus would not be paid, union officers attempted to confer with hotel officials but were rebuffed.

The Hotel argues that it had not breached its promise to pay a bonus before the croupiers went on strike, since its promise had been to pay the bonus on December 20 or 21, and the croupiers struck on the night of December 20. But management representatives had announced to employee representatives in unequivocal terms that no bonus would be paid. That announcement, without having conferred with union representatives, was a unilateral change and an unlawful refusal to bargain in violation of § 8(a)(5).

There was also substantial evidence that the unilateral decision not to pay a Christmas bonus was in retaliation for the Union's filing of an unfair labor practice charge with the Commonwealth Board of Labor Relations. The filing of such a charge—even if, as contended by the Hotel, it was duplicative and thus unreasonable since the dispute had been submitted to arbitration—was clearly protected activity. The Hotel does not argue to the contrary. The Hotel's retaliatory cancellation of the Christmas bonus thus violated §. 8(a)(1) of the Act.

### C. Discharges and Suspensions Resulting from the Strike

Although the pertinent contract between the Union and the Hotel did not contain a no-strike clause, the ALJ found that a no-strike agreement could be inferred from the existence of an arbitration clause. Even an explicit no-strike clause, however, does not waive the right of employees to strike against an unfair labor practice which seriously undermines the collective bargaining agreement. *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 281–84, 76 S.Ct. 349, 357–59, 100 L.Ed. 309 (1956); *Arlan's Department Store of Michigan, Inc.,* 133 N.L.R.B. 802 (1961).

In concluding that the croupiers strike was protected, the ALJ found that the actions of the Hotel management in "peremptorily and crudely rebuff[ing]" union representatives who attempted to discuss cancellation of the Christmas bonus constituted "not only a refusal to bargain ... but total, willful, rejection of the collective bargaining process." We review this finding, affirmed by the Board, with substantial deference. "The Board must be permitted to utilize the expertise it has acquired through experience in determining whether an unfair labor practice is 'serious.' We will not substitute our judgment for that of the Board's, unless it is clearly shown that the Board has acted arbitrarily or capriciously." *NLRB v. Northeast Oklahoma City Mfg. Co.,* 631 F.2d 669, 677 (10th Cir.1980) (company's unilateral delay in making bonus payments amounted to serious unfair labor practice).

Relying on *Dow Chemical Co. v. NLRB,* 636 F.2d 1352 (3rd Cir.1980), the Hotel argues that the dispute over the Christmas bonus was arbitrable and that the Union's failure to pursue the grievance process before going on strike rendered the strike

unprotected. Interpreting *Mastro Plastics, supra,* narrowly, as reaching only "unfair labor practices aimed at supplanting the bargaining representative chosen by the employees", *Dow Chemical* held that, when the contract contains a no-strike clause,[4] a strike arising from an arbitrable contract dispute is unprotected. *Id.* at 1360–61. Because a unilateral change raises the usually arbitrable question of whether the contract gives management the prerogative to make the change in question, this interpretation would leave unprotected most strikes over unilateral changes in working conditions. As the court explained in that case,

"A contract could lawfully relegate solely to management prerogative the disputed matter of a shift change from a seven to a five day work week, and if the Dow contract did so there would have been no § 8(a)(5) refusal to bargain.... Unlike disputes concerning employer interference with employee choice of bargaining representative, such disputes can lawfully be and frequently are resolved, finally, by arbitration." *Id.* at 1360.

But even were we to follow this reasoning, the facts of this case are readily distinguishable. Unlike the strike in *Dow Chemical,* the strike here was undertaken only after the refusal of hotel officials to confer with union representatives. In addition, the unilateral change protested by the strike was itself made to retaliate for the Union's previous filing of an unfair labor practice charge. Though the ALJ offered the opinion that the dispute over the Christmas bonus was arbitrable, he also found that the actions of management in "peremptorily and crudely rebuff[ing]" union representatives' initial attempts to settle the dispute amounted to "total, willful, rejection of the collective bargaining process." We agree that the actions of management were "destructive of the foundations on which collective bargaining must rest", *Mastro Plastics, supra,* and thus among those unfair labor practices in response to which the employees' right to strike is not waived, even by an explicit no-strike agreement.

■ The hotel argues alternatively, relying on *NLRB v. Fanstell Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939), that the means employed by the Union—the initial "sit down" strike or work stoppage—amounted to an illegal seizure of an employer's property, thus rendering the strike action unprotected. *See also Advance Industries Division-Overhead Door Corp. v. NLRB,* 540 F.2d 878, 883–84 (7th Cir.1976). But unlike the striking employees in *Fansteel* or in *Advance Industries,* the striking croupiers here left the premises without incident when requested to do so by the employer. We therefore find nothing in the conduct of the attempted work stoppage[5] which rendered the employees' strike action unprotected. *See United Merchants & Manufacturers, Inc. v. NLRB,* 554 F.2d 1276, 1279; *NLRB v. Pepsi Cola Bottling Co. of Miami,* 449 F.2d 824, 828–29 (5th Cir.1971).

We conclude that it was within the Board's discretion to determine that the Hotel's unilateral cancellation of the Christmas bonus without prior or subsequent discussion with the Union was a sufficiently serious unfair labor practice to excuse a strike in contravention of an implied no-strike agreement. We find nothing in the conduct of that strike that renders it unprotected as a matter of law. We also affirm, and find further discussion unnecessary in doing so, the Board's finding that the Hotel violated § 8(a)(1) of the Act when it required, as a condition of reinstatement, that night shift employees sign a waiver of their statutory rights to file unfair labor practice charges.

---

4. Unlike the pertinent contract in this case, the contract at issue in *Dow Chemical* had a no-strike clause. 636 F.2d at 1355. That clause conditioned the right to strike on exhaustion of "all of the Bargaining and Grievance Procedures outlined in this agreement." *Id.*

5. The ALJ found "that the attempt to stage a sit down strike, whatever the intention of the Union, was forestalled, and that such a strike did not, in fact occur." He found no evidence to support the Hotel's contention that the employees at any point abandoned their tables leaving chips and money unguarded.

### III. *Incidents Involving Employee Felix Ramos*

■ After the strike ended on January 6, 1980, Felix Ramos was appointed by Union officers as an alternate Union steward; he returned to work with the day shift at about that time. On January 26, Ramos was involved in an incident which included his telling a Commonwealth gambling inspector that there were supervisors working gambling tables in the casino contrary to regulations of the Tourism Department. That incident resulted in his discharge on January 28. Sometime in March or April, apparently as the result of union-management negotiations, Ramos was rehired. On June 18, Ramos testified in the Board proceedings in this case. Sometime shortly thereafter Ramos's application for an unpaid leave of absence was denied, and he was given a written warning for allegedly violating a rule against fraternizing with hotel guests.

In early August the General Counsel's complaint in this case was amended to include allegations of violations of the Act associated with Ramos's discharge and reprimand. On August 26 Ramos was elected acting president of the Union. In early September, management officials reassigned Ramos from the day shift to the night shift, thus creating a conflict with another job he held, and cancelled his subsequent swap of schedules with another employee. On September 12 the Union filed an unfair labor practice charge with the Board on behalf of Ramos. That evening Ramos was involved in an argument with a supervisor. The ALJ found that incident was forgiven at the time by the supervisor with the casino manager's approval. But later the same evening, apparently after the general manager's intervention, Ramos was given a discharge letter.

The Hotel argues that the actions taken against Ramos were based on legitimate business concerns unrelated to Ramos's protected activity. But the ALJ, affirmed by the Board, found that the Hotel discharged Ramos twice and took other adverse actions against him because of his union activity, his testimony in a Board proceeding, and his filing of a charge with the Board, thus violating §§ 8(a)(1), 8(a)(3), and 8(a)(4) of the Act.

■ Once the Board has made a prima facie showing that an employee's discharge or discipline was improperly motivated, the burden shifts to the employer to "come forward with enough evidence to convince the trier of fact that, under the circumstances, there is no longer a preponderance of evidence establishing a violation." *NLRB v. Amber Delivery Service, Inc.,* 651 F.2d 57, 69 (1st Cir.1981). *See also NLRB v. Wright Line,* 662 F.2d 899, 904–07 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *NLRB v. Transportation Management Corp.,* 674 F.2d 130 (1st Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 372, 74 L.Ed.2d 506 (1982). Reviewing the record as a whole, we find substantial evidence supporting the Board's conclusion that the reasons advanced by the Hotel for actions taken against Ramos were pretextual and that those actions were in fact taken in retaliation for Ramos's protected activity.

*The petition to set aside the Board's order is denied; the Board's cross petition for enforcement is granted.*