**Ruben F. LIMA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Keco Industries, Inc., Intervenor.**

**No. 86–1182.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1987.

Decided May 19, 1987.

David M. Silberman, with whom Harry Huge, Gary K. Harris, Allison Beck and Laurence Gold, were on brief, for petitioner. Angelo V. Arcadipane, Washington, D.C., also entered an appearance for petitioner.

Marc B. Seidman, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson and Barbara A. Atkin, Attys., N.L.R.B., Washington, D.C., were on brief, for respondent.

David L. Barth, Cincinnati, Ohio, with whom William R. O'Brien, Washington, D.C., was on brief, for intervenor.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court by Circuit Judge EDWARDS.

Dissenting opinion filed by Circuit Judge WILLIAMS.

HARRY T. EDWARDS, Circuit Judge:

In January of 1982, the petitioner, Ruben F. Lima, filed an unfair labor practice charge with the General Counsel of the National Labor Relations Board ("NLRB" or the "Board"), accusing respondent Keco

Industries, Inc. ("Keco"), his employer, of violating sections 8(a)(1) and (3) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (3) (1982), by discharging him in retaliation for having engaged in protected union activities. The General Counsel investigated the charge and issued a complaint against Keco. After a hearing, the Administrative Law Judge ("ALJ") issued his findings of fact, conclusions of law, and recommendations on January 19, 1983. *Keco Indus., Inc.*, 276 N.L.R.B. No. 167 (1983) (*"ALJ Decision"*). The ALJ found that, in discharging Lima, Keco had committed an unfair labor practice, and he therefore recommended that Lima be reinstated with back pay. *Id.* at 24–26. In a terse opinion, the Board rejected the ALJ's recommendations and dismissed the complaint. *Keco Indus., Inc.*, 276 N.L.R.B. No. 167 (1985) (*"Board Decision"*). Lima now seeks review of the Board's decision.

For the reasons hereinafter given, we grant the petition for review and remand for further consideration.

## I. BACKGROUND

The relevant facts are undisputed. Keco employs about three hundred people at its military equipment manufacturing plant in Cincinnati, Ohio. In September of 1981, after Keco and the bargaining representative of its two hundred production workers failed to reach agreement in their contract negotiations, the production workers went on strike. Most of the striking workers returned to work after a new collective bargaining agreement was executed in November of 1981. However, Keco discharged four of the strikers, including Lima, for engaging in alleged misconduct during the strike. *ALJ Decision* at 2.

Lima's discharge was based exclusively on the following incident. On September 26, 1981, at about 11:15 a.m., an independent security guard sitting in a company van outside the back gate [1] of Keco's plant saw Lima walking along railroad tracks that paralleled Keco's property about sev-

enty-five feet or more from where the guard was sitting. The guard observed "a small caliber pistol sticking out of [Lima's] belt line," and called his lieutenant to report a man "on the tracks with a gun." At the hearing before the ALJ, the guard testified that he "think[s]" he was "sure" that he saw a pistol, but that it was "possible" that he was wrong. *Id.* at 21.

By the time the lieutenant and a third guard had reached the back of the plant, Lima had disappeared down the tracks. The lieutenant and the third guard left, but received another radio call shortly thereafter and returned to find Lima and an unidentified individual walking back along the tracks toward the plant. From about thirty to forty feet, the lieutenant saw in Lima's waistband something that "appeared to be a revolver" and which the lieutenant believed to be an "[a]pproximately 22 caliber weapon." After "[j]ust a couple of minutes," Lima moved away. *Id.* at 21–22.

The lieutenant sent for the police and then went to the front of the plant, where he saw Lima but no gun. After someone loudly mentioned that the police had been summoned, Lima got into his car and drove to a parking lot across the street. When the police arrived a few minutes later, they found no gun on Lima, in his car, or in the vicinity. *Id.* at 22.

Despite some ambiguity in the evidence, the ALJ concluded that "the weapon was a genuine 22 caliber pistol." *Id.* However, the ALJ also found that Lima

was not seen holding the pistol in his hand, and thus gave no evidence of "apparent willingness to use" the gun. The record contains no indication that any nonstriking employees were in the vicinity at the time (11:15 a.m. or thereabouts) at which Lima was spotted; the shift begins at 7 a.m. and ends at 3:30 p.m. This decision to stick a pistol in his belt was evidently a rapidly passing fancy on Lima's part. Guard Bishop said that he had "seen Mr. Lima a lot during the

---

1. The back gate was being used as the plant entrance for nonstriking workers at the time of

this incident. *ALJ Decision* at 24 n. 33.

strike," but these few moments were the only time that he had detected Lima wearing a pistol.

*Id.* at 23–24.

The ALJ concluded that Lima's conduct did not constitute "serious misconduct" disqualifying him from reinstatement under the standards set forth in *NLRB v. Illinois Tool Works*, 153 F.2d 811, 815–16 (7th Cir. 1946); *General Telephone Co.*, 251 N.L.R.B. 737, 738–39 (1980), *enforced mem.*, 672 F.2d 894 (D.C.Cir.1981); *MP Industries, Inc.*, 227 N.L.R.B. 1709, 1710 (1977); *W.C. McQuaide, Inc.*, 220 N.L.R.B. 593, 594 (1975), *enforced as modified*, 552 F.2d 519 (3d Cir.1977); and *Coronet Casuals, Inc.*, 207 N.L.R.B. 304, 304–05 (1973). *ALJ Decision* at 2–6, 24. The ALJ described this standard as follows:

> The statute has no interest in protecting misconduct not fairly classifiable as the venting of human emotion, and more properly adjudged to be a calculated effort to apply force in a manner which meaningfully infringes upon the rights of nonstrikers, the employer, and the remainder of society. When a striker engages in the sort of non-"exuberant" misconduct for which the employer might well discharge an employee in a nonstrike situation, there is no discernible reason for according special protection to the employee. And that, I take it, is essentially what is meant by the Board's requirement that the disqualifying misconduct be regarded as "serious."

*Id.* at 6. The ALJ found particularly relevant to the instant case the Board's decision—and the Seventh Circuit's reversal—in *Advance Industries Division—Overhead Door Corp.*, 220 N.L.R.B. 431 (1975), *rev'd in relevant part*, 540 F.2d 878 (7th Cir.1976). In *Advance Industries*, the Board upheld an ALJ's conclusion that a striker's actions in aiming a gun at the employer's factory, without firing it, did not warrant denial of reinstatement. *Id.* at 431, 439.[2] The Seventh Circuit reversed:

> [The striker's] actions could not have failed to direct attention to her and to what she was doing. The actions were openly performed in the picketing area of a plant which was not shut down but which was attempting to continue its operation with non-strikers. Word that strikers were armed could have a strong coercive effect on non-strikers; a striker's apparent willingness to use a weapon makes the effect even stronger. That this effect was not demonstrated to the ALJ is not relevant; the misconduct still occurred.

540 F.2d at 882, *quoted in ALJ Decision* at 23. Because, in contrast, Lima showed no "apparent willingness to use" the gun and was never seen with the gun in his hand, and because there was no evidence that any non-striking employees were in the vicinity at the time Lima made his appearance, *ALJ Decision* at 23, the ALJ found that Lima's case was distinguishable from *Advance Industries:*

> The foregoing circumstances, as well as the decision of the full Board in *Advance Industries*, lead me to conclude that the Board would not consider Lima to be guilty of "serious misconduct" in wearing in his belt for these few minutes, out of sight of nonstriking employees and off company property, what probably was a 22 caliber pistol. I agree [with Keco] ... that "[t]o allow a striking employee openly to wear a weapon in the vicinity of a picket line would be to flirt with disaster and to encourage intimidation," but I would at least require a showing that the striker knowingly flaunted the weapon in the presence of nonstrikers.

*Id.* at 24. Accordingly, the ALJ concluded that, in discharging Lima, Keco had committed an unfair labor practice, and recommended that Lima be reinstated with back pay. *Id.* at 24–26. The Board summarily rejected the recommendations of the ALJ and dismissed the complaint. *Board Decision* at 1–3.

---

**2.** The Board later reached a similar result in *Mosher Steel Co.*, 226 N.L.R.B. 1163, 1166 (1976), where it held that a striking employee who held a large rock in each hand while shouting and making threatening gestures at a truck-driver did not forfeit his reinstatement rights under the Act.

## II. Discussion

The brevity and conclusory character of the Board's decision stand in sharp contrast to the ALJ's careful analysis. The decision of the Board first recites the test articulated in *Clear Pine Mouldings*, 268 N.L.R.B. 1044 (1984), which held that strikers forfeit their reinstatement rights when they engage in "misconduct ... that, under the circumstances existing, ... may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *Id.* at 1046, *quoted in Board Decision* at 1. The Board then states, without analysis, that "in these circumstances, Lima's conduct was the kind of misconduct that would reasonably tend to coerce or intimidate employees in the exercise of their Section 7 rights," and that Lima had therefore forfeited his reinstatement rights. *Board Decision* at 1–2. The Board's opinion observes that "[t]he salient fact here is that Lima carried and displayed a weapon in the vicinity of the plant entrance used by nonstrikers," *id.* at 2; however, the Board makes no attempt to explain why this fact is "salient" or to identify exactly what "circumstances" persuade the Board that Lima's conduct satisfied the *Clear Pine Mouldings* standard. The Board's decision is further confused by a passing comment, in a footnote of the opinion, noting that Chairman Dotson would apply a *per se* rule:

> Chairman Doston [sic] finds it difficult to envision any set of circumstances where weapon carrying in the tense atmosphere created by a picket line would not reasonably tend to be coercive under the standard of *Clear Pine Mouldings*, supra.

*Id.* at 2 n. 1. However, because this position is offered without comment or response, it is unclear to what extent the Chairman's views reflect those of the other two members of the Board panel. With no further clarification, the Board's opinion summarily dismisses the complaint.

From such a sparse opinion we are unable to discern either the Board's reasoning or its factual assumptions. We cannot tell, for example, whether the Board intends to adopt Chairman Dotson's *per se* rule. Furthermore, in determining what constitutes *"mis*conduct," we do not understand whether the Board views the *legality* of the petitioner's conduct as relevant. In other words, if Lima violated no law, can he be found to have engaged in misconduct? In addition, it is unclear whether the Board assumes that other employees saw (or could have seen) Lima's gun. If such an assumption underlies the Board's decision, it is unclear whether there is any evidence to support the factual conclusion. And, if there is no evidence to suggest that other employees saw Lima with a gun, and thus no evidence that they could have been threatened, on what grounds can it be found that Lima's conduct "reasonably tend[ed] to coerce or intimidate employees in the exercise of rights protected under the Act"?

Without some explanation of how the Board reached its conclusion, we have no basis in the record upon which to evaluate whether the Board's application of the *Clear Pine Mouldings* rule is rational, based on substantial evidence, and consistent with the Board's own precedents.[3] Accordingly, we grant the petition for review and remand this case to the Board for further consideration and a reasoned opinion, thereby providing a meaningful basis for judicial review under 5 U.S.C. § 706(2) (1982). *See, e.g., Darr v. NLRB*, 801 F.2d 1404, 1408–09 (D.C.Cir.1986) (remanding where Board did not clearly explain the basis for its decision); *cf. Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 806 F.2d 269, 273–74 (D.C.Cir.1986) (remanding

---

**3.** The dissenting opinion labors long and hard to fill these gaps. Its creative rewriting of the record apparently aims to simplify the case considerably for the Board on remand. Had the dissenting opinion been the opinion on review before this court, there arguably would be no need for further consideration by the Board. However, we remain faithful to the principle that a court can adjudicate only the case before it, not the case it wishes were before it. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

where Board failed to explain departure from precedent).

*So Ordered.*

WILLIAMS, Circuit Judge, concurring and dissenting:

Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3) (1982), prohibit an employer from interfering with an employee's right to strike, or from discriminating against an employee for the exercise of that right. This prohibition shields a striking employee from an employer's retaliatory refusal to rehire, but only up to a point. The National Labor Relations Board recently defined that point, stating in *Clear Pine Mouldings,* 268 N.L.R.B. 1044, 1046 (1984), that an employee loses his right to reinstatement when he engages in "misconduct ... that, under the circumstances existing, ... may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act."

During a strike at Keco Industries, Inc., striker Ruben Lima twice approached the plant gate used by nonstriking workers, sporting a gun in his belt. *Keco Indus., Inc.,* 276 N.L.R.B. No. 167 at 21–24 (1983) (*"ALJ Decision"*). When first spotted by a security guard, he retreated. Lima approached again, this time to within 30 to 40 feet of two guards who had come to the gate in response to the first guard's call for assistance. Again he retreated. When police officers responding to the security guards' summons found Lima, he had no gun. As the Administrative Law Judge believed the witnesses who said they saw one in Lima's belt, *id.* at 22, the necessary inference is that he discarded it in the meantime.

The Board's succinct opinion identified as "salient" the fact that "Lima carried and displayed a weapon in the vicinity of the plant entrance used by nonstrikers. Lima offered no excuse or explanation for his action here; rather, he denied having a gun at all, which denial the [ALJ] discredited." *Keco Indus., Inc.,* 276 N.L.R.B. No. 167 at 2 (1985) (*"Board Decision"*). Accordingly, it found that "in these circumstances" Lima's behavior was "the kind of misconduct that would reasonably tend to coerce or intimidate employees in the exercise of their Section 7 rights [here, the right not to strike]," and, under *Clear Pine Mouldings,* was not protected from employer sanction. *Id.* at 1–2 (footnote omitted).

The *Clear Pine Mouldings* doctrine is not here under attack. Nor, so far as I can discern, does the majority deny that the Board *may* find Lima's conduct within its strictures. So far we agree. The majority nevertheless reverses the Board's decision, because it finds it impossible "to evaluate whether the Board's application of the *Clear Pine Mouldings* rule is rational, based on substantial evidence, and consistent with the Board's own precedents." Majority Opinion at 303.

Unlike the majority, I have no problem discerning the path of the Board's route from the statute to its decision. *See, e.g., Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) ("we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Detailed exposition is hardly needed to show that guns are intimidating. *See, e.g., McLaughlin v. United States,* —— U.S. ——, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15 (1986) ("the display of a gun instills fear in the average citizen"). In a strike situation, mere "[w]ord that strikers were armed could have a strong coercive effect on nonstrikers; a striker's apparent willingness to use a weapon makes the effect even stronger." *Advance Industries Div.— Overhead Door Corp. v. NLRB,* 540 F.2d 878, 882 (7th Cir.1976).

Although the record does not contain evidence of the presence of nonstrikers at the plant gate when Lima approached with his gun, *see ALJ Decision* at 23, the Board clearly regarded his approaches as having a sufficient *tendency* to coerce or intimidate. The Board's conclusion would be obvious if Lima had approached a group of nonstrikers with his gun concealed, reached for it, and been apprehended by security officials a second before any nonstriker actually laid eyes on the gun. *See, e.g., Local 542, Int'l Bhd. of Operating Engi-*

*neers v. NLRB*, 328 F.2d 850, 852–53 (3rd Cir.) ("That no one was in fact coerced or intimidated is of no relevance."), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964); *Highway Truck Drivers & Helpers Local 107 v. NLRB*, 273 F.2d 815, 818 (D.C.Cir.1959) (regardless of success, union's attempt to bring about secondary boycott violated § 8(b)(4)(A) of the Act). The difference between that case and the present one lies in the vigilance of the security officers; it does not excuse Lima.

Contrary to the ALJ's characterization of Lima's decision to "stick a pistol in his belt" as a "rapidly passing fancy," *ALJ Decision* at 24, the record clearly indicates that he acted with deliberate purpose. *Cf. Advance Industries*, 540 F.2d at 882 (striker "did not inadvertently bring the gun to the picketing scene"). Twice Lima approached the plant gate, which is located adjacent to the employee parking lot. These approaches occurred at approximately 11:15 AM, a time when workers on the 7:00 to 3:30 shift could be expected to be on or about to begin their lunch break. *See ALJ Decision* at 23–24. Moreover, when the security guards' alertness drove Lima away from the gate area, he did not take his weapon elsewhere but proceeded to the front of the plant where other strikers were congregated. *See ALJ Decision* at 22; Joint Appendix at 119.

The tense atmosphere surrounding the strike clearly demonstrates the coercive effect Lima's open possession of a weapon would have wrought had security officers been less vigilant. Violence, and threats of more violence, had already occurred. The day before Lima's escapade, a striker had thrown a rock at a nonstriker's car. *ALJ Decision* at 11. The rock-thrower had also threatened the occupants, saying he would "blow your ... heads off." *Id.* at 12. As he was known to carry a gun and had told one of the victims that he had "beat [his wife] in the head with his pistol," *id.* at 12 n. 19, they could hardly have discounted the threat; testimony indicates that they were "scared and shook up," *id.* at 13. Lima's open display of a gun would clearly have had a similar effect.

Nor need the status of Lima's gun under Ohio law concern us. As the Board does not mention it, we may safely infer that it believed it irrelevant to whether Lima's behavior would tend to coerce or intimidate nonstrikers. Such a view seems clearly permissible. The Board is charged with administering federal labor policy, not state gun control legislation. Moreover, the lawfulness of gun possession (if it be lawful in Cincinnati, Ohio) would surely not express a public policy in favor of persons bringing such weapons to tense confrontations; a state's decision to allow the use of gasoline does not express approval of those who toss it on fires.

Finally, the Board noted that Lima offered no "excuse or explanation for his action." *Board Decision* at 2. *Compare Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 738 F.2d 1404, 1409 (4th Cir.1984) (where it was common in community for workers to wear small sheathed knives, a striker's doing so, unaccompanied by any threatening gestures, did not reasonably tend to intimidate). There can be no reasonable objection to the Board's willingness to consider mitigating factors. Lima, however, did not suggest any; he simply denied carrying a gun.

There is, to be sure, ambiguity in the Board's opinion. It is unclear to what extent it regards the context here—incidents of violence and threats—as critical in finding that the employer may sanction a striker for bringing a gun to the picketing site. Chairman Dotson evidently believed that sanctions were permissible in the absence of such a context. A footnote states that he

> finds it difficult to envision any set of circumstances where weapon carrying in the tense atmosphere created by a picket line would not reasonably tend to be coercive under the standard of *Clear Pine Mouldings....* He notes also that our decision here imposes no arguable burden on protected concerted activity. To avoid the risk of lawful discharge strikers need only to leave deadly weapons at home. Seeking excuses for this type of misconduct only encourages brinksmanship.

*Board Decision* at 2 n. 1. The Chairman's apparent need to articulate the position pre-

sumably reflects his belief that the majority relied in part on violence and threats antedating Lima's action. Their decision not to reach out and set a general rule was surely within the range of adjudicative discretion.

In carrying out our duties of judicial review we must of course assure ourselves that the agency followed a reasoned path from its statutory authority to its conclusion. But we are not grading essays. Insistence on thorough explication of every point carries a cost: diversion of agency resources from the more difficult cases and delay of its entire process. *Cf. Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985). Where the Board's action is squarely within its authority, I think a simple statement is enough.[1]

The record clearly supports the Board's conclusion that "Lima's conduct was the kind of misconduct that would reasonably tend to coerce or intimidate." *Board Decision* at 1–2. I would affirm.

---

**1.** I am baffled by the majority's praise for the ALJ's opinion ("careful analysis," Majority Opinion at 303). It was fairly long, to be sure (four single-spaced typewritten pages on this issue alone). But its primary intellectual effort was an exegesis of the Board's thinking in a decision that the Court of Appeals for the Seventh Circuit had reversed in *Advance Industries Div.-Over-* *head Door Corporation v. NLRB,* 540 F.2d 878 (7th Cir.1976); I see nothing especially admirable in analysis seemingly built on the premise that the Board would flout the Seventh Circuit's reading of the law. The hazard of all this is that the Board may conclude that it is safe if its opinions are wordy.